UNITED ENGINEERING &
FORGING, Plaintiff,

v.

The UNITED STATES of
America, Defendant.

Court No. 87–10–01046.

United States Court of
International Trade.

Nov. 18, 1991.

Fried, Frank, Harris, Shriver & Jacobson, David E. Birenbaum and Alan Kashdan, Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Sheila N. Ziff and Jane E. Meehan, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Stephanie J. Mitchell, of counsel, and Office of the Gen. Counsel, U.S. Intern. Trade Com'n, Lyn M. Schlitt, James A. Toupin and George W. Thompson, Washington, D.C., for defendant.

Collier, Shannon & Scott, David A. Hartquist, Michael R. Kershow, Kathleen Weaver Cannon, Nicholas D. Giordano and Robin H. Gilbert, Washington, D.C., for intervenor-defendant Wyman–Gordon Co.

## OPINION AND ORDER

AQUILINO, Judge:

In this action, the plaintiff challenges the *Final Determination of Sales at Less Than Fair Value, Certain Forged Steel Crankshafts From the United Kingdom,* 52 Fed.Reg. 32,951 (Sept. 1, 1987), reached by the International Trade Administration, U.S. Department of Commerce ("ITA"); the material-injury determination of the U.S. International Trade Commission ("ITC") *sub nom. Certain Forged Steel Crankshafts From the Federal Republic of Germany and the United Kingdom,* 52 Fed.Reg. 35,004 (Sept. 16, 1987); and the antidumping-duty order entered thereon [1].

The plaintiff United Engineering & Forging ("UEF") has interposed a motion for judgment upon the agency records. On its part, the intervenor-defendant served a motion for judgment on the ITA record and more recently a motion to dismiss the entire action, including its consolidated, contingent claim for relief, on the ground that subsequent administrative proceedings carried out by the ITA pursuant to 19 U.S.C. § 1675 have made matters herein moot.

Since the bringing of those motions, the intervenor-defendant has filed a voluntary stipulation of dismissal of its action No. 87–10–01051 upon a representation that

> Wyman–Gordon Company, the original petitioner in the antidumping proceeding that gave rise to the above-referenced consolidated action, completed the sale of its Danville, Illinois crankshaft manufacturing facility to Krupp Gerlach Crankshaft Co., a subsidiary of Krupp Stahl AG of Germany. By virtue of this sale, Wyman–Gordon is no longer a domestic producer of forged steel crankshafts and therefore has no further interest in the antidumping proceeding or the above-referenced consolidated action.

---

1. 52 Fed.Reg. 35,467 (Sept. 21, 1987). Jurisdiction over the action is based on 28 U.S.C. § 1581(c). Subsequent to its commencement, the petitioner below, Wyman–Gordon Company, brought an action, CIT No. 87–10–01051, contesting that part of the ITA determination which "erroneously considered whether the merchandise was or was not produced by the process of twisting in its selection of 'such or similar' merchandise." That action was ordered consolidated with the above-encaptioned one, into which Wyman–Gordon Company had already intervened as a party defendant.

Receipt of the stipulation caused the court to confer with counsel as to its implications, if any, for the action at bar, referring, among other things, to *Oregon Steel Mills Inc. v. United States*, 862 F.2d 1541 (Fed.Cir.1988).

No guidance has been forthcoming, whereupon the court concludes that, while dismissal of an action pursuant to CIT Rule 41(a)(1)(B) which has been consolidated with other action(s) is properly effectuated by way of prior motion to sever therefrom, at a minimum, the intervenor-defendant no longer desires resolution of its motion for judgment on the agency record. On the other hand, the motion to dismiss on the ground stated has not been automatically dispelled.

## I

■ Indeed, the issue of whether or not this action has become moot must still be discussed and first. *E.g., North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971); *Nuove Industrie Elettriche di Legnano v. United States*, 14 CIT ——, ——, 739 F.Supp. 1567, 1568 (1990). The intervenor-defendant summarized its motion as follows:

> UEF's appeal of Commerce's antidumping determination was rendered moot by publication of the results of the first administrative review. The case is moot because UEF's arguments go to the rates established by the order, rather than the validity of the order itself or the applicability of the order to UEF. Moreover, UEF has not established that acceptance of its claims would result in revocation of the order; indeed, UEF concedes that its case might result in "substantially lower margins rather than the invalidity of the order itself." Finally, there is no authority that would require this Court to remand the case to the ITC in the event that a remand to Commerce resulted in lower margins.

Thus, since there is no live case or controversy remaining as to the margins determined in the underlying investigation, UEF's action challenging such margins should be dismissed as moot.[2]

In fact, not only have the results of the ITA's first administrative review been published[3], as indicated in the instant motion, the results of a second such review are also now at hand *sub nom. Final Results of Antidumping Duty Administrative Review: Certain Forged Steel Crankshafts From the United Kingdom*, 56 Fed.Reg. 5,975 (Feb. 14, 1991), as amended, 56 Fed. Reg. 10,860 (March 14, 1991). Nonetheless, the defendant does not support dismissal, stating that,

> due to the nature of United Engineering & Forging's claims, Commerce is unable to support Wyman–Gordon's claim that all issues concerning Commerce's determination were rendered moot by the issuance of the final results of the first administrative review without completely reanalyzing and recalculating the dumping margin based upon the alternative claims made by United Engineering & Forging and Wyman–Gordon Company.

The plaintiff claims that this action challenges the validity of the antidumping-duty order itself and also that, "since the margin of dumping is relevant to the injury determination, the LTFV counts continue to raise live issues, even assuming that this Court were to determine that the margin was reduced but the antidumping duty order should remain in effect."[4]

The intervenor-defendant refers to this court's decision in *Nuove Industrie Elettriche di Legnano v. United States, supra*, to the effect that subsequent administrative reviews usually moot existing lawsuits based on prior such reviews or administrative determinations, citing cases like *McKechnie Brothers (N.Z.) Ltd. v. U.S. Dep't of Commerce*, 14 CIT ——, 735

---

**2.** Reply of Wyman–Gordon Company to the Responses of United Engineering & Forging and the United States to its Motion to Dismiss, p. 11.

**3.** *See Certain Forged Steel Crankshafts From the United Kingdom; Final Results of Antidumping*

*Duty Administrative Review*, 55 Fed.Reg. 45 (Jan. 2, 1990).

**4.** Memorandum [of] United Engineering & Forging in Opposition [to] Wyman–Gordon Company's Motion to Dismiss, p. 4.

F.Supp. 1066 (1990), *Fabricas El Carmen, S.A. de C.V. v. United States*, 12 CIT 129, 680 F.Supp. 1577 (1988), *Alhambra Foundry v. United States*, 10 CIT 330, 635 F.Supp. 1475 (1986), and *Silver Reed America, Inc. v. United States*, 9 CIT 221, 1985 WL 25761 (1985), and that the exception to this result is where the validity or applicability of the underlying antidumping or countervailing duty order is challenged, which was the situation, for example, in *PPG Industries, Inc. v. United States*, 11 CIT 303, 660 F.Supp. 965 (1987). As stated in *Nuove Industrie*, 14 CIT at ——, 739 F.Supp. at 1570, mootness "occurs when the relief sought, and the issues raised thereby, are tied inextricably to duties on particular entries."

This is not the case here. As indicated above, plaintiff's complaint contests the antidumping-duty order, which UEF claims is predicated upon faulty determinations by both the ITA and the ITC. That the issues raised are still live is evident to the court after careful consideration of the entire records, and this conclusion is further buttressed by comparing UEF's complaint with the one it has recently filed, challenging the results of the ITA's second administrative review, CIT No. 91–03–00219.

## II

The goods covered by the contested order are forged carbon or alloy steel crankshafts with a shipping weight between 40 and 750 pounds, whether machined or unmachined, and classified during the period of investigation under items 660.6713, 660.-6727, 660.6747, 660.7113, 660.7127 or 660.-7147 of the Tariff Schedules of the United States. The ITC staff report describes this merchandise as follows:

> Forged crankshafts between 40 and 750 pounds in weight are primarily used in engines with vehicular applications, whereas forged crankshafts outside this weight range are primarily incorporated in engines with other than vehicular applications. The crankshafts subject to investigation are used principally in diesel (and to a lesser extent, large gasoline)

engines for on-highway trucks and tractors (e.g., class 6, 7, and 8 trucks). Other end uses are diesel engines for off-road equipment (construction, mining and material handling, and stationary power equipment); farm machinery and equipment; military vehicles (both track and wheel varieties, such as tanks, personnel carriers, systems carriers, and other ground vehicles); certain aircraft engines; smaller diesel marine engines; and diesel engines for automobiles.

Crankshafts are used in internal combustion engines to transform the reciprocal action of the engine's pistons (connected to the crankshaft itself with connecting rods) into rotational energy or torque. In vehicles, the crankshaft is connected to the transmission and driveshaft, which ultimately power the wheels of the vehicle. Each crankshaft is generally produced to customer specifications on a job-order basis, but crankshafts of the same design produced by different manufacturers are generally interchangeable.[5]

In its final determination, the ITA concluded that the foreign-market value of such crankshafts from the United Kingdom exceeded the United States price by a weighted-average amount of 14.67 percent.

The motion of the plaintiff U.K. manufacturer contests this determination on a number of counts, including (1) the ITA's choice of a home-market comparison model crankshaft was erroneous; (2) the agency erred in using a quarterly exchange rate to convert home-market sales prices into dollars; (3) the ITA made errors in the adjustment process; and (4) the agency erroneously included shipments past the period of investigation in calculating the weighted-average margin. In addition, the plaintiff complains that (5) the ITC should have examined the relevant imports on a transaction-by-transaction basis; (6) the Commission should not have considered sales to two UEF customers; (7) the ITC should not have found any material injury by reason of the sales determined to be at less than

---

**5.** ITC record document ("ITC Doc") 164 (USITC Pub.2014), p. A–3 (Sept. 1987).

fair value; and (8) the Commission should not have cumulated imports.

### III

■ On the issue of choice of a foreign-market comparison model, 19 U.S.C. § 1677(16) defines "such or similar merchandise" to mean goods in the first of the following categories in respect of which a determination as to imposition of antidumping duties can be made:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

The record reveals that sales of UEF crankshafts to one U.S. customer during the period of investigation were the primary focus of the ITA. Three different models of crankshaft were sold (in more than minimal quantities). Two of the models were for placement in six-cylinder engines for light and light-medium trucks and thus possessed six "throws"—or arms to which pistons attach by means of connecting rods. The third was a four-throw crankshaft for use in engines designed for agricultural, construction and industrial applications.

The ITA and UEF agreed, in the end, as to which six-throw crankshaft sold in the U.K. should be used for purposes of home-market comparison. They disagreed over the four-cylinder comparator. In particular, UEF is reported to have commented during the ITA proceedings that, pursuant to the foregoing statute, the agency should have considered all relevant factors in making that model selection, including non-physical differences such as the purposes for which the merchandise is used and its commercial value. See 52 Fed.Reg. at 32,-953 (*Comment 1*). The ITA countered that it

selected comparable models based on the criteria used in arriving at the preliminary determination, namely number of throws, weight, and forging method, with the addition of twisting. We believe these criteria enable us to select merchandise meeting the statutory requirements for most similar merchandise.

Respondent's arguments concerning commercial value and end-use have described the end-use of the machines in which the crankshafts are used, rather than the end-use of the crankshafts themselves.

52 Fed.Reg. at 32,954. This statement of position went on to claim that there were "no well-established designations for types of merchandise in the crankshaft industry." *Id.*

The plaintiff now argues that, by

rejecting volume and end use as selection criteria, the ITA, in effect, assured an LTFV finding, because the wide differences in commercial value directly attributable to these factors are not dealt with in the adjustment process. In consequence, dumping margins were found not because U.E.F. was engaged in discriminatory pricing, but because the ITA chose a home market comparator which was priced higher than the [alternative] model sold ..., reflecting unadjustable—but very real—differences in end use, volume and, therefore, commercial val-

ue.[6]

It further argues that the statutory framework "requires" the ITA to take all relevant factors into account, including those pressed by the plaintiff. UEF Memorandum, p. 19.

Of course, on its face, that "framework" does not so require, nor, for that matter, is defendant's contention that the statute does not permit this type of analysis [7] well taken. Reality is that the agency has broad discretion in the administration of the antidumping law. As indicated, in making its choice herein of a four-cylinder U.K. crankshaft model for comparison, the ITA relied on physical features: number of throws and weight, as well as forging method and appearance, as delineated by counterweights. The record contains a chart presented by UEF [8] which arrays data as to four-throw models. Those data clearly point to substantial similarity of physical characteristics between the U.S. model and the U.K. comparator selected by the ITA.

Additional columns on UEF's chart do provide a factual foundation for its position as to volume and end use, and argument to the effect that the end use of a crankshaft in an Allis Chalmers is hardly comparable to that in an Alfa Romeo has merit. However, this court is empowered by 19 U.S.C. § 1516a(b)(1)(B) to set aside only those final ITA determinations unsupported by substantial evidence on the record or otherwise not in accordance with law, and neither statutory requirement for such relief is met on the question of four-cylinder comparator choice.

There is substantial evidence on the record in support of the ITA position. As for plaintiff's prayer that the agency also consider non-physical criteria in making its selection [9], in *Timken Company v. United States*, 10 CIT 86, 98, 630 F.Supp. 1327, 1338 (1986), the court stated:

It is of particular importance that the administering agency itself make the required determination of what constitutes most similar merchandise ..., considering that the issue may be a complex one on which reasonable minds could differ. For example, of two potentially "similar" foreign market products, one product could be most similar to merchandise sold in the United States in its use, while the other might be more similar in its materials. It is the administering agency rather than an interested party that should make the determination as to what "similar" characteristics are of the most significance. Additionally, it is hard to imagine that a foreign manufacturer, given the option of selecting what constitutes similar merchandise, and assuming that there exists more than one product from which a choice can be made, would not make the choice of merchandise most advantageous to itself.

If, for example, there were two foreign market products that could be considered "similar" but which differed in value, a foreign manufacturer would have an incentive to select as "similar" the product that was of lower value, and such selection could result in lower margins. Congress could not have intended that an interested party be accorded so much control over a determination of such importance. [footnote omitted]

This statement of the law is of continuing moment. For example, in *Monsanto Com-*

---

**6.** Memorandum of Plaintiff United Engineering & Forging in Support of Motion for Judgment on the Agency Record ("UEF Memorandum"), p. 19.

**7.** *See* Memorandum of Defendant United States in Opposition to the Respective Rule 56.1 Motions of Plaintiff United Engineering & Forging and Plaintiff Wyman–Gordon Company for Judgment on the Administrative Record of the International Trade Administration [hereinafter "ITA Memorandum"], p. 29.

**8.** *See* ITA record confidential document ("ConfDoc") 11 for the chart, which is reproduced (in confidence) at page 26 of the ITA Memorandum.

**9.** The plaintiff points to ITA regulations for support, in particular 19 C.F.R. § 353.14 (Differences in quantities) *et seq.*, but the preceding section 353.13 indicates that those provisions cover entitlement to any adjustments for "differences" in the merchandise under consideration rather than selection thereof for that consideration.

*pany v. United States,* 12 CIT 937, 698 F.Supp. 275 (1988), the court upheld ITA comparison of chlorinated derivatives of cyanuric acid even though their use differed in the domestic market from that in the foreign market. *Kerr–McGee Chemical Corp. v. United States,* 14 CIT ——, 741 F.Supp. 947 (1990), affirmed agency equation of electrolytic manganese dioxide with differing degrees of alkalinity, which meant different ultimate uses in the marketplace. In *NTN Bearing Corporation of America v. United States,* 14 CIT ——, 747 F.Supp. 726 (1990), the court sustained ITA methodology adopted to weigh six criteria in comparing physical characteristics of tapered roller bearings—to the exclusion of any other considerations. *U.H.F.C. Company v. United States,* 916 F.2d 689, 691, 697 (Fed.Cir.1990), agreed with the ITA position that grades of animal glues "used in widely varying applications" could nevertheless "reasonably be compared".

In the light of such cases, this court cannot conclude that it was not in accordance with law for the agency to have looked to the physical characteristics of the merchandise at issue herein.

## IV

The plaintiff contends that the ITA determination is also flawed as a result of reliance on a quarterly exchange rate in evaluating UEF's sales in the United States on August 29, 1986. At the time, 19 C.F.R. § 353.56(a) provided that, in

> determining the existence and amount of any difference between the United States price and the fair value or foreign market value for the purposes of this part or of the Act, any necessary conversion of a foreign currency into its equivalent in

United States currency shall be made in accordance with the provisions of section 522 of the Tariff Act of 1930, as amended (31 U.S.C. [§ 5151]):

> (1) As of the date of purchase or agreement to purchase, if the purchase price is an element of the comparison[,]

whereupon the ITA relied on the rate certified on July 1, 1986, the first day of the relevant calendar quarter. That rate, $1.5495, proved to be the highest for any day during that period. The plaintiff maintains that the agency should have applied either the six-month-forward rate [10] used by UEF in its pricing or the rate in effect on August 29, 1986. Alternatively, plaintiff's position is that the agency should have followed the special rules for fair value investigations set forth in 19 C.F.R. § 353.56(b) [11] and "lagged" the exchange rate by a quarter.

### A

 The ITA rejected this third, alternative position per the following rationale:

> ... If exchange rates in this case are considered to have been characterized by "sustained" changes, respondent's evidence has not shown price readjustment or other reaction to such changes within a reasonable period of time as required by *Melamine.* Nor does the evidence support a finding of "temporary" exchange rate changes, so that the second test cited by the respondent is inapplicable.

52 Fed.Reg. at 32,955, referring to *Melamine Chemicals, Inc. v. United States,* 732 F.2d 924 (Fed.Cir.1984).

The plaintiff points to its long-term commitment contract and the fact that the "forward exchange markets—which are

---

**10.** The record indicates that the Federal Reserve Bank of New York and other banks publish such a rate "to reflect exchange rates expected to be prevailing in the ... next six months.... The six-month forward exchange rate is, therefore, the projected rate of monetary conversion for six months from a specific date." ITA Doc 119 (ConfDoc 40), p. 3.

**11.** The text of this subsection was as follows: *Special rules for fair value investigations.* For purposes of fair value investigations,

manufacturers, exporters, and importers concerned will be expected to act within a reasonable period of time to take into account price differences resulting from sustained changes in prevailing exchange rates. Where prices under consideration are affected by temporary exchange rate fluctuations, no differences between the prices being compared resulting solely from such exchange rate fluctuations will be taken into account in fair value investigations.

supposed to be the best predictor of future exchange rate movements—consistently predicted future exchange rates *lower* than current spot rates" during the months prior to February 1986. UEF Reply Memorandum, p. 41 (emphasis in original). It downplays the strengthening of the British pound by arguing that the amount (3.5 percent) over that length of time was insignificant and UEF's long-term commitment to the U.S. importer served to temper any reconsideration of price. The plaintiff claims that it was not until that February when the pound began to strengthen "dramatically", which led to renegotiation several months later. Four months then passed before a new agreement was reached. The plaintiff argues that these facts demonstrate that UEF acted "with eminently reasonable due speed." *Id.* at 42. The plaintiff also contends that the exchange rate was experiencing temporary volatile shifts, claiming that the dramatic increase against the dollar occurred from the second to the third quarter and referring to "an even sharper decline" in the dollar from that quarter to the fourth. UEF Memorandum, p. 52.

Be that as it may, the court is not permitted to substitute its view of reasonableness for that of the agency. *See, e.g., Matsushita Electric Industrial Co. v. United States,* 750 F.2d 927, 936 (Fed.Cir.1984). Judicial review is to "ascertain whether there was a rational basis in fact for the determination". *American Lamb Company v. United States,* 785 F.2d 994, 1004 (Fed.Cir.1986), quoting S.Rep. No. 249, 96th Cong., 1st Sess. 252 (1979), U.S. Code Cong. & Admin.News 1979, pp. 381, 638. On the record at hand, the court concludes that such a basis exists for the ITA's decision not to lag the rate of exchange.

### B

▮ As for UEF's position on application of the rate in effect on August 29, 1986, the ITA stated:

Section 353.56(a) requires that currency conversions be made "in accordance with the provisions of section 522 of the Tariff Act of 1930, as amended" (31

U.S.C. 5151), which provides that "[t]he Federal Reserve Bank of New York shall decide the buying rate" (31 U.S.C. 5151(e)). The Tariff Act also directs that the conversions be made at quarterly rates, unless the rate on any given day varies from the quarterly rate by five percent or more, in which case the actual daily rate is to be used (31 U.S.C. § 5151(c), (d)). Therefore, contrary to Respondent's contention, we are obliged to use quarterly rates absent the five percent variance provided for in the Tariff Act, or absent circumstances which would permit us to apply the "special rule" of § 353.56(b) of the regulations. Even if the "special rule" could be applied in this case, UEF has not provided sufficient evidence to support its assertion that its pricing is directly linked to, or based on, the six-month forward exchange rate.

52 Fed.Reg. at 32,955.

The plaintiff does not question in general the five-percent rule but does point out that use of a daily rate when variation is less than five percent has precedent in *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States,* 10 CIT 424, 640 F.Supp. 255, *remand results aff'd,* 10 CIT 608, 645 F.Supp. 956 (1986). In that case, the court concluded that it was "not reasonable to find dumping by a firm with only ten relevant home market sales during the period of investigation solely because of Commerce's use of quarterly exchange rates." 10 CIT at 430, 640 F.Supp. at 260. Here, the plaintiff emphasizes that, over the 13–month period investigated by the ITA, October 1, 1985 to October 31, 1986, sales were made pursuant to agreement with the U.S. importer in one quarter, and there were only three home-market sales, which were not in the same one. Moreover, the July 1, 1986 certified rate was the highest for any day in the quarter.

Plaintiff's points have merit, but the actual variance as of August 29, 1986 did not amount to five percent. Then again, the plaintiff in *Luciano Pisoni* was able to convince the court that "no margin would result if Commerce were to use the rates

prevailing at the time of the transactions"[12], which has not been the case here.[13] In short, the ITA's determination not to rely on the rate for August 29, 1986 is sustained on the record and the law.

### C

■ *Melamine Chemicals, Inc. v. United States, supra,* held that 31 U.S.C. § 5151 governs the assessment and collection of duties, not less-than-fair-value investigations. The ITA retains discretion in the application of exchange rates in order to properly determine whether sales have, or have not, been at less than fair value. *E.g., Pistachio Group of the Ass'n of Food Indus., Inc. v. United States,* 11 CIT 668, 671 F.Supp. 31 (1987). *See also The Budd Company, Wheel & Brake Div. v. United States,* 14 CIT ——, 746 F.Supp. 1093 (1990); *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States, supra.* As one analyst stated herein: "The statute and the regulations neither require nor prohibit the use of rates other than the 'daily rate,' [they] simply do not specify which rate to use". ITA Doc 119 (ConfDoc 40) at 2, 4. The defendant asserts that, in

> doing business internationally, any firm assumes the risks that come with the possibility of changes in exchange rates. UEF may not pass that burden on to the Department, nor may it claim that such a risk justifies dumping merchandise. The latter argument is actually the one made by UEF when it claims that it would have been commercially unacceptable to renegotiate prices with its customer. If it was "commercially unacceptable" to sell at prices calculated according to the daily exchange rate, or more nearly ap-

proximating the daily exchange rate than the rates UEF actually used in the contract, then surely UEF must have known that it was, in all likelihood, dumping the merchandise in the United States. The Department must follow its regulations, which clearly specify the rate to be applied. The rate so applied must be a "neutral" one, not one tied to a particular firm's alleged practices or policies at a given time and place.

ITA Memorandum, pp. 42–43 (footnote omitted).

Nonetheless, the ITA has an obligation to apply a rate of exchange or make adjustment appropriate to the circumstances under investigation.

The special rules of section 353.56(b) presume an ability to accommodate longer-term trends but recognize that such accommodation is more problematic for the short run. Under these rules, which, in essence, amount to a circumstances-of-sale adjustment[14], if a party can link its approach to the sales under investigation, the ITA has the prerogative, emanating "from Commerce's duty to enforce fairly the anti-dumping laws", to follow that approach. *Melamine Chemicals, Inc. v. United States,* 732 F.2d at 933. For example, *Final Determination of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 54 Fed.Reg. 18,992, 19,085–86 (May 3, 1989), adjusted for forward currency hedging in view of "the very specific factual pattern presented".[15]

■ Here, the agency concluded that UEF had not provided sufficient facts to

---

**12.** *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States,* 10 CIT 424, 430, 640 F.Supp. 255, 261, *remand results aff'd,* 10 CIT 608, 645 F.Supp. 956 (1986).

**13.** *See, e.g.,* UEF Reply Memorandum, pp. 32–33 and p. 44, n. 34, showing calculations resulting in margins above *de minimis,* albeit barely, if a lagged or daily rate is applied.

**14.** *See, e.g., The Budd Company, Wheel & Brake Div. v. United States,* 14 CIT ——, ——, 746 F.Supp. 1093, 1100–01 (1990); *Amended Final Determination of Sales of Less Than Fair Value*

*and Amended Antidumping Order; Tubeless Steel Disc Wheels from Brazil,* 53 Fed.Reg. 34,-566, 34,566–67 (Sept. 7, 1988).

**15.** The plaintiff seeks to brief that determination, which the defendant opposes on the ground, among others, that additional briefing is not necessary. The court agrees, and plaintiff's motion is therefore hereby denied. Moreover, the court is cognizant that the roller-bearing matter is currently the subject of an appeal *sub nom. The Torrington Company v. United States,* CIT No. 89–06–00359 (1990).

support the assertion that its pricing was directly linked to, or based on, a six-month-forward rate. However, the record does not adequately support this conclusion. Rather, it reveals that UEF submitted an affidavit from its group financial controller, attesting, in part:

3. In connection with the sale of crankshafts in the United States and third country markets under long-term (1–3 year) supply agreements, U.E.F.'s policy is to avoid risk associated with fluctuations in exchange rates. This policy is expressed in the Company's Foreign Exchange Procedure, annexed as Appendix A which provides, in part, that all trading transactions, including exports of goods, which are denominated in foreign currencies, are to be covered by forward foreign exchange contracts.

4. In implementing U.E.F.'s exchange rate policy, sales personnel engaged in negotiating the price of crankshafts sold for currency other than sterling are also required by company policy to ascertain from the Chief Accountant ... the six month forward exchange rate for the sale of foreign currency. This rate is relied upon in formulating U.E.F.'s prices to its U.S. customers. These exchange rates ... are evidenced in the letter from the Company's bankers ... annexed as Appendix B. By way of further implementation of U.E.F.'s policy, U.E.F. regularly contracts for the forward sale of foreign currency to be derived from the export of crankshafts. Annexed as Appendix C are copies of several such forward sales contracts entered into during the period of investigation.[16]

UEF submitted a "Report on Certain Aspects of Anti–Dumping Defence of United Engineering & Forging" prepared by Coopers & Lybrand, stating that the "commercial reality" of

fixing selling prices for export is not only dependent upon the price in US currency but also on the expected exchange rate between the producer's currency and customer's currency of operation. The view on profit that is taken by management in accepting a selling price in US Dollars is dependent upon the expected sterling returns calculated on the forward exchange rates.

... [T]he decision to accept prices in the USA market was based upon the UEF policy of covering forward exchange rate receipts[;] ... logically, the same forward exchange rates must be used to convert price comparisons of UK sales denominated in sterling to US sales denominated in dollars. The use of any other rate does not properly reflect the margin on which management made their pricing decision.

ITA Doc 105 at exhibit 3. UEF submitted a copy of the work paper of its export sales director, prepared in connection with the pricing negotiations with the U.S. importer in May 1985, a document tending to indicate reliance upon a forward rate rather than a spot rate. ITA ConfDoc 37, pp. 2–3 and exhibit B.

The plaintiff contends that the August 1986 prices were similarly set with reference to a six-month-forward rate. UEF Memorandum, p. 46, n. 39. There is little indication in the record that this approach was explored during the verification visit to UEF by the ITA team. The team's report does show that it verified customer contracts, including the one relevant here, which demonstrate price and percentage requirements for importers to submit schedules "specifying the quantity and the dates on which the crankshafts are needed"; that a "key proposal" in UEF's negotiations was inclusion of a trigger pricing mechanism; and that this mechanism led to price adjustments during the period of investigation. *See* ITA Doc 103, p. 4 and

---

16. ITA Doc 105, vol. II, exhibit 12. The referenced appendix B is indication of the spot, three- and six-month forward rates available from UEF's bank on various dates during the period of investigation. Appendix C displays a total of eleven contracts. In addition, UEF provided an exhibit showing the 10 a.m. midpoints (*i.e.,* between buy and sell quotes) as of February 25 and August 29, 1986 for the spot and forward rates published by the Federal Reserve Bank of New York for interbank money market quotes. ConfDoc 29, vol. II, exhibit 14.

ConfDoc 26, pp. 6–8. But, the actual terms under which UEF traded with the U.S. importer (or elsewhere) apparently were not further pursued. Thus, the record does not reveal an agency position on the Coopers & Lybrand report, or on the other relevant submissions, nor does it otherwise reveal an attempt to either confirm or disprove that UEF trading transactions were, in fact, covered by or linked to forward-foreign-exchange rates during the period of investigation. *Cf.* ITA Doc 105 at exhibit 12.

If the ITA's disregard of UEF's claimed approach was the result of a perception that the law required such disinterest, it was erroneous. The agency had the authority to investigate the actual foreign-exchange circumstances of UEF's sale(s) and, on the substantial record presented, to verify them. Failure to have done so requires remand to the ITA for proper verification and concomitant reconsideration of whether or not a forward-exchange rate should be relied on in computing the margin of dumping, if any.

### V

The plaintiff alleges that the ITA committed certain other errors, specifically in regard to a cost-of-credit adjustment and in denial of an adjustment for partial reimbursement paid by the U.S. importer for tooling shouldered by UEF on the importer's behalf. Additionally, the plaintiff contests the agency's expansion of the period of investigation.

### A

■ Since UEF did not borrow funds to finance its accounts receivable, the ITA determined to impute a cost of credit. UEF requested that the agency use the prevailing U.S. short-term interest rate rather than the rate in the United Kingdom. The ITA rejected the argument and, following its "policy", used a rate at which UEF could have borrowed pounds in the home market. *52 Fed.Reg. at 32,955 (Comment 9).*

In *LMI–La Metalli Industriale, S.p.A. v. United States,* 912 F.2d 455, 460 (Fed.Cir. 1990), agency verification found "several U.S. dollar short-term loans outstanding during the period of investigation" whose rates "were all lower than the 9.5% dollar rate attributed to the period". The ITA took the position that the loans were to finance purchases of raw materials, not finished products. The court of appeals, however, concluded that it was "not reasonable to presume that a commercial enterprise would borrow at almost twice the available rate", stating:

> ... The time value of money is not an arbitrary fiction, but must correspond to a dollar figure reasonably calculated to account for such value during the gap period between delivery and payment. If the cost of credit is imputed in the first instance to conform with commercial reality, it must be imputed on the basis of usual and reasonable commercial behavior.

*Id.* at 460 and 461.

The plaintiff contends that adjustment to foreign-market value for a difference in terms of credit in the U.S. and foreign markets is a function of the "length of time elapsed between shipment to and payment by the customer, the value of the shipment and the interest rate applied in calculating the cost to the seller of extending the credit." UEF Memorandum, p. 58. The higher the cost of credit on a per-diem basis, the greater the differential.

There is some difference of opinion in the parties' arguments as to whether UEF should have been presumed to borrow or to invest the opportunity cost of extending credit to purchasers. *Compare, e.g., id.* at 63, UEF Reply Memorandum at 45 *and* WGC Memorandum at 53 *with* 52 Fed.Reg. at 32,955 *and* ITA Memorandum at 46–47. However, *LMI–La Metalli* indicates that the presumption is to borrow and, furthermore, that a rational borrower will look for the lowest possible rate (inflation-adjusted) across international borders. On the other hand, it might also be rational to conclude that circumstances like restrictions on movement of capital or the volatility of exchange rates foreclose foreign borrowing. The matter can be further complicat-

ed by transactions in several countries, particularly whether they would source from single or multiple market(s). *Cf.* ITA Memorandum at 49: "In the absence of actual borrowings by the firm, it is equally reasonable for the ITA to turn to the short-term borrowing rate in the country within which the respondent firm is located and does business, which, in the vast majority of cases, is the rate most likely to be the rate which would be experienced by the firm if, in fact, it chose to borrow". This assertion may be true, but it is without substantial support in the record before this court.

In this action, if U.S. short-term interest rates were lower, an urge to borrow dollars could have been intensified by the appreciation of the pound. Whatever the actual rates at the time, argument before the ITA and here indicates that those in the United States were indeed lower. For example, plaintiff's reply memorandum notes (at page 46, n. 35) that "the U.S. prime lending rate averaged 8.33 percent, while U.K. base lending rates averaged approximately 11 percent." In any event, to properly impute a cost of credit against the UEF receivables for the period of investigation requires remand to the agency to determine the U.S. rate, compare it with the rate or rates prevailing in the United Kingdom, and utilize the U.S. rate if in fact lower. *Cf. LMI–La Metalli Industriale, S.p.A. v. United States, supra.*

### B

■ The plaintiff contends that the ITA incorrectly disallowed an adjustment for the U.S. importer's partial payment under agreement to reimburse UEF tooling ex-

penses for one of the six-throw crankshafts, the manufacturing of which was to have had a life beyond the period of investigation. The comparable homemarket sales were without similar reimbursement for tooling. In its final determination, the agency rejected UEF's request for adjustment as having been raised for the first time post-verification in its brief and thus untimely.[17]

This may have been true, but the need to revisit on remand other issues will now enable the ITA to consider the point pressed. *Cf. Koyo Seiko Co. v. United States,* 14 CIT ——, 746 F.Supp. 1108 (1990); *Serampore Industries Pvt. Ltd. v. U.S. Dep't of Commerce,* 12 CIT 825, 834, 696 F.Supp. 665, 673 (1988).

### C

■ The ITA's determination states that the crankshafts under investigation

are normally sold to the United States on the basis of long-term requirements contracts. Therefore, in order to capture the most recent sales ... to the United States, we extended the period of investigation (POI) to encompass the 13 months from October 1, 1985, to October 31, 1986, as permitted by § 353.38(a) of our regulations.[18]

The plaintiff argues that the ITA determined that the period of investigation, once defined,

could not be enlarged to include earlier sales, even though the consequence was to exclude nearly eighty percent of the shipments made in the investigatory period. In calculating weighted average less than fair value margins, however, the ITA displayed remarkable flexibility, in-

**17.** *See* ConfDoc 29, vol. I, p. 84 and vol. II, exhibit 3 at appendix D. *See also* ITA Memorandum, pp. 50–52.

**18.** 52 Fed.Reg. at 32,951. Section 353.38(a) stated:

Upon publication of the notice of "Initiation of Anti-dumping Investigation," the Secretary shall proceed promptly to obtain such information as may be necessary for preliminary and final determinations of sales at less than fair value. The Secretary normally will exam-

ine at least 60 percent of the dollar volume of exports to the United States from any country subject to an antidumping investigation. Ordinarily the Secretary will require a foreign manufacturer, producer, or exporter subject to the investigation to submit pricing information covering a period of at least 150 days prior to, and 30 days after, the first day of the month during which the petition was received in acceptable form. The Secretary may, however, require the submission of pricing information for such other period as he deems necessary and he may also require the sub-

cluding shipments beyond October 31, 1986 with respect to sales made within the period. That makes no sense. Simply put, if the period of investigation, once fixed, can never be altered, then the determination must be binding on both ends—start and finish. Shipments made after October 31, 1986 are no more relevant than sales made prior to October 1, 1985.... Moreover, the very point of having a defined period of investigation is negated if that period has a fixed beginning but a flexible end. Shipments made after October 31, 1986, thus, should have been excluded.

UEF Memorandum, pp. 64–65. The defendant attempts to explain now that

each *sale* was followed by *shipments* of goods over a period of time, which might be as long as several years. The Department['s] calculations took into account all *shipments*, made at whatever time pursuant to the specific *sales* which fell within the period of investigation. Otherwise many shipments made after the period of investigation pursuant to sales made during the investigatory period might never be investigated, thus skewing the less than fair value weighted-average margin.

ITA Memorandum, pp. 52–53 (emphasis in original).

It is not clear from the record, however, that any such shipments made after the period of investigation would escape scrutiny. Moreover, as the plaintiff points out [19], the agency rationale obfuscates the distinction between the less-than-fair-value investigation and assessment. *See Brother Industries, Ltd. v. United States*, 15 CIT ——, 771 F.Supp. 374 (1991). The defendant also contends that, under "UEF"s theory, only merchandise concerning which both the *sale and* the *shipment* took place within the period of investigation, could be subject to an antidumping investigation." ITA Memorandum, p. 56 (emphasis in original). However, this is a narrow reaction to plaintiff's point, namely, a cut-off date is inherently arbitrary. On the other hand, whatever the appeal of plaintiff's call for

mission of pricing information on a current basis....

consistency, the taking into account of shipments beyond the original period of investigation was a matter of agency discretion for which the court may not substitute its own judgment even though it could come justifiably to a different conclusion had the court the burden of reviewing the matter *de novo. Ipsco, Inc. v. United States*, 13 CIT ——, ——, 710 F.Supp. 1581, 1583 (1989), *aff'd in part, rev'd in part*, 899 F.2d 1192 (Fed.Cir.1990), citing *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986), and *American Spring Wire Corp. v. United States*, 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom. Armco Inc. v. United States*, 760 F.2d 249 (Fed.Cir.1985). The standard of review is whether the agency determination is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). And the record is to be reviewed for "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Such evidence exists in support of the ITA's choice of period of investigation.

## VI

That standard of review applies with equal force to the challenged determination of the ITC. As indicated above, the Commissioners determined, the Chairman dissenting, that "an industry in the United States is materially injured by reason of imports from the Federal Republic of Germany and the United Kingdom of certain forged steel crankshafts ... that have been found by the Department of Commerce to be sold in the United States at less than fair value (LTFV)." ITC Doc 164, p. 1; 52 Fed.Reg. 35,004 (footnote omitted). The views of the Commission are stated to be

based on the poor condition of the domestic industry producing forged steel crankshafts as evidenced by production, shipments, employment, and financial indicators, as well as underselling and in-

19. *See* UEF Reply Memorandum, p. 49.

creased market penetration by imports at a time when the U.S. market for forged steel crankshafts as a whole was shrinking.

ITC Doc 164, p. 3. Characterizing the matter as "very difficult" [20] and a "close case" [21], the additional views of the Vice Chairman include:

> The evidence in these investigations did not unequivocally indicate that quality was much more important to purchasers than price. Thus, price must have been somewhat significant. That being the case, the cumulative effect of dumping by the West Germans and British, as well as the alleged subsidization by the Brazilians and the presence of the Japanese products under investigation, had a material effect on the U.S. industry. Therefore, I make an affirmative decision in this case.[22]
>
> \* \* \* \* \* \*
>
> I have also considered the weighted average margin for cumulated imports. While it is low in this case (4.1 percent), the cumulated market share is very high, thus amplifying any revenue effect resulting from unfair imports.... I ... conclude, on balance, that unfairly traded imports caused material injury.[23]

In dissent, the Chairman's views differed from those of the majority only on the issue of causation, including:

> ... [T]he legislative history shows that the mere presence of LTFV imports is not sufficient to establish causation.[24]
>
> \* \* \* \* \* \*
>
> ... Although market penetration is quite high, the pricing data is inconclusive and none of the other factors support an affirmative determination. The margins of dumping are extremely low. Purchasers regard quality as extremely important and view the domestic product as inferior to the imported product. Domestic

prices have stabilized. There are no significant barriers to entry. In this case I have analyzed and weighed each of these factors and reached a negative determination.[25]

### A

■ In challenging the Commission's determination, the plaintiff argues that, given the "unusual market factors" in the crankshaft industry, the ITC should have approached its responsibilities on a transaction-specific basis. That is, prices were bid individually and would not have had any "spillover" effect on other contracts. Thus, according to the plaintiff, even if the ITA's determination of UEF sales at less than fair value were supportable, those sales could not, and therefore did not, cause injury to the crankshaft industry as a whole.

The ITC has recognized that the governing statute "contemplates that most imports, like most articles in commerce, will be off-the-shelf items sold through ordinary sales processes rather than made-to-order items sold through bidding processes" [26] and that transaction-specific analysis can be of assistance in determining material injury. But such an approach is not required by the statute. *Cf. Sandvik AB v. United States*, 13 CIT ——, ——, 721 F.Supp. 1322, 1330 (1989), *aff'd*, 904 F.2d 46 (Fed.Cir.1990); *Copperweld Corp. v. United States*, 12 CIT 148, 165–66, 682 F.Supp. 552, 569 (1988).

In this action, the Commission did consider the particular condition of the market, examining "aggregate indicators of the volume and effects of the imports under investigation, because the record reflects that many sales contracts for imported crankshafts are not strictly binding and can be modified, or in some cases terminated, due to quality or delivery problems or changes

---

20. ITC Doc 164, p. 25.

21. *Id.* at 33.

22. *Id.* at 26.

23. *Id.* at 33.

24. *Id.* at 37–38.

25. *Id.* at 46–47.

26. *Offshore Platform Jackets and Piles from the Republic of Korea and Japan,* USITC Pub. 1708 at 9 (June 1985).

in the exchange rate." ITC Doc 164, p. 17, n. 51. Further, "some purchasers dual-source their crankshafts [and,] ... while crankshafts are usually produced to customer specifications on a job-order basis, crankshafts of the same design produced by different manufacturers are generally interchangeable." *Id.* (citations omitted). In short, the ITC considered "the entire record ..., including data on individual purchases and prices of individual crankshafts." *Id. See also* ITC ConfDoc 24 at A–23 to A–25, A–31, A–88 to A–92.

**B**

▇ The plaintiff argues that, since UEF sales to two U.S. companies were not considered by the ITA, they should not have been considered by the Commission. That is, there were few sales during the usual, six-month timeframe initially chosen for the ITA investigation, whereupon that agency had referred back to October 1, 1985 and had defined date of sale as the "date the price is confirmed in writing since that is the first date the price is finalized." 52 Fed.Reg. at 32,952. The plaintiff contends that the decision to rely on that definition resulted in consideration of only 20 percent of its shipments during the period investigated. Those not considered went to the two U.S. customers of UEF, and no determination was made as to whether they were at less than fair value. While apparently recognizing that "it is not possible to link each sale considered by the ITC with an LTFV determination by the ITA"[27], the plaintiff nevertheless complains that "these shipments should not have been considered in determining whether LTFV sales were a cause of material injury." Plaintiff's Memorandum, p. 78.

The ITC's position has been that it is "not required to limit [its] analysis to those particular imports that Commerce has found to be at LTFV." ITC Doc 164, p. 17, n. 51. The Commission now argues that it merely followed its statutory mandate to consider whether imports of the same class or kind of merchandise as those subject to

the ITA's affirmative determination were injuring the domestic industry—there is no "inference" as to whether unexamined sales were also at less than fair value. *See* ITC Memorandum, pp. 46–47.

Antidumping duties are imposed if the ITA determines "that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value" and the ITC determines that a domestic industry is materially injured "by reason of imports of that merchandise". 19 U.S.C. § 1673. In *Algoma Steel Corporation v. United States,* 865 F.2d 240, 241 (Fed.Cir.), *cert. denied,* 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 590 (1989), the court of appeals described this division of responsibilities as follows:

In the intricate administrative machinery Congress has erected over the years for dumping and countervailing duty cases, one unique feature is the allocation of responsibility to two agencies otherwise independent of one another, the Commerce Department and the ITC, the requisite injury determination for the latter, and everything else for the former.... Commerce, determining sales at LTFV have occurred, normally makes no finding as to what percentage of all sales they are, but rather and in lieu thereof, states a "dumping margin" which is a weighted average adjusting appropriately for the MTFV [more than fair value] sales. The ITC says it is not told how many or which the MTFV sales were and the raw data that was before the Commerce Department is of no use to it because its injury determination covers a different time frame.

That court considers the language of section 1673 to be plain and unambiguous, stating if "a 'class or kind' of that merchandise is sometimes sold at LTFV, the terms of any individual sale do not matter." *Id.* at 242.

Here, the ITA found that imports of certain forged steel crankshafts from the United Kingdom are being, or are likely to be, sold in the United States at less than

fair value. 52 Fed.Reg. at 32,951. Accordingly, the Commission considered all imports of that class or kind of merchandise in determining whether or not the domestic industry was injured by reason of those imports.

The plaintiff attempts to distinguish *Algoma* on the grounds of fungibility of the merchandise therein and the ITA's having "investigated all of the respondent's U.S. sales, and found some to be at fair value and others, not", resulting in a weighted-average margin applicable to all of that importer's U.S. sales. Plaintiff's Reply Memorandum, pp. 60–61. In this action, plaintiff's sales did not have the benefit of those deemed fairly traded. *See id.* Dissimilar facts in *Algoma*, however, do not render its legal analysis inapposite. The ITC "does not look behind ITA's determination, but accepts ITA's determination as to which merchandise is in the class of merchandise sold at LTFV." *Algoma Steel Corp. v. United States*, 12 CIT 518, 522, 688 F.Supp. 639, 644 (1988), *aff'd, supra.* *See also Iwatsu Electric Co. v. United States*, 15 CIT ——, ——, 758 F.Supp. 1506, 1510 (1991); *Sandvik AB v. United States*, 13 CIT at ——, 721 F.Supp. at 1332–33; *Sony Corporation of America v. United States*, 13 CIT ——, ——, 712 F.Supp. 978, 984 (1989).

### C

The plaintiff challenges the Commission's conclusion that injury to the domestic industry was by reason of imports from the United Kingdom. The contention is that Wyman–Gordon did not seriously compete for the sales at issue, which should have been the only business considered by the ITC because it entailed the only sales found at less than fair value by the ITA. *See* Plaintiff's Memorandum, p. 81. The plaintiff acknowledges that Wyman–Gordon did submit bids, but states that they would not have been accepted due to a lower one by another competitor. *See id.* at 82. In addition, even if the sales to the other two U.S. companies were properly considered by the Commission, they could

not have caused material injury to Wyman–Gordon because both firms had rejected its product due to quality problems. *See id.* at 85–88.

 The focus of the ITC, however, is on whether or not the domestic industry as a whole is experiencing material injury. *Copperweld Corp. v. United States*, 12 CIT at 165–66, 682 F.Supp. at 569. And as stated by the Court of International Trade in the *Algoma* action, 12 CIT at 523, 688 F.Supp. at 644:

ITC has wide latitude in deciding whether imports of the merchandise in the class defined by ITA are causing material injury. The court sees no reason to compel it to view sales by sales data and attempt to match up LTFV sales with evidence of lost U.S. sales.

In determining whether material injury is by reason of less-than-fair-value imports, the Commission is not to weigh causes, rather it must determine whether unfairly-traded imports are contributing to such injury to the domestic industry. *Metallverken Nederland B.V. v. United States*, 13 CIT ——, ——, 728 F.Supp. 730, 740, *remand results aff'd*, 13 CIT ——, 744 F.Supp. 281 (1989); *LMI–La Metalli Industriale, S.p.A. v. United States*, 13 CIT ——, ——, 712 F.Supp. 959, 971 (1989), *aff'd in part, rev'd in part*, 912 F.2d 455 (Fed.Cir.1990). *See also* H.R.Rep. No. 317, 96th Cong., 1st Sess. 47 (1979). Such imports, therefore, need not be the only cause of harm to the domestic industry. *See id.* and *Iwatsu Electric Co. v. United States*, 15 CIT at ——, 758 F.Supp. at 1512.

The plaintiff points to Wyman–Gordon's (1) "chronic excess capacity, (2) its decision to maintain [an] outmoded, inefficient and redundant ... facility, (3) its long-standing problem of poor quality, (4) the relentless drive by crankshaft purchasers to secure lower prices for the crankshafts they purchase, and (5) the growing competition from cast crankshafts"[28] as the reasons for its difficulties, noting that the "ITC concluded otherwise but did so on several

28. Plaintiff's Memorandum, p. 89.

false premises as to the role of LTFV imports." Plaintiff's Memorandum, p. 88.

From the record, it is apparent that the ITC recognized other factors as affecting the domestic industry. *See* ITC Doc 164, pp. 19–22. Nonetheless, as pointed out in *Iwatsu Electric,* the issue for the court is whether, despite such other factors, the Commission's determination that less-than-fair-value sales were causing material injury is supported by substantial evidence on the record. *See* 15 CIT at ——, 756 F.Supp. at 1512. *See also LMI–La Metalli Industriale, S.p.A. v. United States,* 13 CIT at ——, 712 F.Supp. at 971; *Wieland Werke, AG v. United States,* 13 CIT ——, ——, 718 F.Supp. 50, 56 (1989). In making its determination, the ITC shall consider

(I) the volume of imports of the merchandise which is the subject of the investigation,

(II) the effect of imports of that merchandise on prices in the United States for like products, and

(III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States; and

"may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports." 19 U.S.C. § 1677(7)(B).

The plaintiff, apparently, has chosen not to dispute the ITC's specific findings on these statutory counts.

For the purposes of the foregoing subsection (I), "the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). Here, the ITC determined that the volume of imports was significant, rose from 1984 through 1986 but decreased in value, and then increased as to both volume and value through January–March 1987. ITC Doc 164, pp. 17–18, A–35 to A–37; ITC ConfDoc 24, pp. A–66, A–67 to A–71. Market penetration also rose sharply in volume and value, leading to the conclu-

sion that imports "constituted a significant and increasing presence in the U.S. market at a time when the market as a whole was shrinking." ITC Doc 164, p. 18. *See also* ITC ConfDoc 24 at A–73 to A–78.

In regard to price, the Commission is directed to "consider whether (I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii).

On this issue, information presented reflected "significant" underselling of the domestic product by imports and generally declining producer and purchaser prices during the period of investigation. ITC Doc 164, pp. 18, A–37 to A–43; ITC ConfDoc 24, pp. A–79 to A–92. The ITC concluded that these factors demonstrated that the material injury experienced by the domestic industry was by reason of the imports under investigation.

The Commission further found that it would find material injury due solely to imports from West Germany and the U.K., as the unit volume of imports "essentially doubled" from 1984–1986 and rose sharply from January–March 1987. ITC Doc 164, p. 19. A similar trend was evident in levels of market penetration. Pricing information "indicate[d] aggressive importer behavior." *Id.* The ITC determined that "[i]mports from the U.K. in particular were priced substantially below domestic prices, and displaced domestic material." *Id.;* ITC ConfDoc 24, pp. A–85, A–87, A–90.

### D

The plaintiff argues that the ITC unlawfully cumulated imports from the United Kingdom with those from Japan and Germany because the ITA reached negative determinations as to the former and because UEF was not in competition with the latter. The plaintiff also argues that, as a general proposition, cumulation was not appropriate at all in this determination be-

cause of a lack of competition between importers and the domestic industry. *See generally* Plaintiff's Memorandum, pp. 89–101.

Cumulation is mandated if imports are subject to investigation and compete with each other and the domestic like product. 19 U.S.C. § 1677(7)(C)(iv). While the record indicates that the ITA issued a negative preliminary determination on crankshafts from Japan in May 1987, the ITC's final determination issued in September of that year—or before the ITA reached a final negative result with respect to Japan.

■ In deciding to cumulate the Japanese merchandise, the Commission looked to the language of the statute, which requires cumulation if the imports are subject to investigation, to wit: "Imports of crankshafts from Japan are subject to an ongoing investigation by the Department of Commerce which may (or may not) result in a final determination of LTFV sales and, accordingly, are subject to investigation within the meaning of the statute." ITC Doc 164, p. 14. Despite plaintiff's arguments that this reading of the statute "does ... violence to the legislative intent that only unfairly traded imports be cumulated" and "could lead to serious abuses of the process" [29], it is apparent that the Japanese imports remained under consideration at the time the ITC issued its final determination and thus were "subject to investigation" within the meaning of subsection (iv). *Cf. Chaparral Steel Company v. United States*, 901 F.2d 1097, 1105 (Fed.Cir.1990) (imports no longer subject to a pending investigation not subject to cumulation).

Moreover, three Commissioners (and therefore a majority within the meaning of 19 U.S.C. § 1677(11)) determined that they would also find material injury "due solely to unfair imports from West Germany and the U.K." ITC Doc 164, p. 19.

■ In determining whether or not imports are competing for purposes of subsection iv, the Commission will examine (1) the degree of fungibility, including evidence of specific customer requirements and other quality-related questions; (2) the presence of sales or offers to sell in the same geographic markets; (3) the existence of common or similar channels of distribution; and (4) the simultaneous presence of imports in the marketplace. *Wieland Werke, AG v. United States*, 13 CIT at ——, 718 F.Supp. at 52; *Florex v. United States*, 13 CIT ——, ——, 705 F.Supp. 582, 592 (1989). These factors, however, are not exclusive; all that is required is a " 'reasonable overlap' in competition." *Wieland Werke AG v. United States*, 13 CIT at ——, 718 F.Supp. at 52, quoting *Granges Metallverken AB v. United States*, 13 CIT ——, ——, 716 F.Supp. 17, 22 (1989).

■ The plaintiff contends that cumulation with the West German imports was not appropriate because UEF did not compete "as a qualified supplier" for the same contracts. Plaintiff's Memorandum, p. 98. Yet, UEF concedes that it did submit bids to a German firm's primary U.S. customer "from time to time [but] never did so when it was in a position to obtain *any* ... business". *Id.* at 99, n. 83 (emphasis in

29. Plaintiff's Memorandum, pp. 96–97. Doubt has been expressed as to whether imports should be cumulated in such a circumstance. In *Certain Fresh Cut Flowers from Canada, Chile, Colombia, Costa Rica, Ecuador, Israel and the Netherlands*, USITC Pub. 1956, p. 67 (March 1987), for instance, Commissioner Rohr stated that

... I have strong doubts whether Congress intended that imports subject to a preliminary negative determination should be considered in a cumulative analysis.

These imports are still literally "subject to investigation". However, whether or not they will finally be judged to be unfairly traded is highly doubtful. In my experience, it is rare

for a negative preliminary determination by Commerce to be reversed to a final affirmative or for a preliminary affirmative to result in a final negative. I am inclined to believe that the issue of cumulating imports receiving a preliminary negative Commerce determination is an issue that Congress did not really consider in drafting the current law.

*Cf.* Mock, *Cumulation of Import Statistics in Injury Investigations before the International Trade Commission*, 7 Nw. J. Int'l L. & Bus. 433, 444 (1986).

In any event, the Commissioners in the action at bar were unanimous in their decision to cumulate the Japanese imports.

original). In any event, the ITC determined that imports from all countries under investigation

were present in the U.S. market throughout the period of investigation. Moreover, since producers and importers ship forged steel crankshafts almost exclusively to original equipment manufacturers, imports and domestic like products move through similar channels of distribution.

None of the parties questioned the existence of sales or offers to sell imported crankshafts within the same geographical markets. As to the fungibility of the imported and domestic products, we note that while individual crankshafts are generally produced to customer specifications on a job-order basis, crankshafts of the same design produced by different manufacturers are generally interchangeable. For these reasons, we have cumulated the LTFV imports of forged steel crankshafts from Japan, Brazil, West Germany, and the U.K. for the purpose of assessing their effects.

ITC Doc 164, pp. 15–16. But the plaintiff claims that the very nature of the market rendered cumulation meaningless [30]: The products are not competing—each crankshaft is specially produced for a specific engine design—and therefore one sale will have no impact, price or otherwise, on another. Thus, factors such as a similar geographic market and simultaneous market presence are not relevant. *See generally* Plaintiff's Memorandum, pp. 91–94.

The Commission determined, however, that although crankshafts are "generally produced to customer specifications on a job-order basis ... crankshafts of the same design produced by different manufacturers are generally interchangeable." ITC Doc 164, p. A–3. The record shows that purchasers often will solicit bids from several suppliers, foreign and domestic, and at least one purchaser tended to order specific crankshafts from more than one producer. *See id.* at A–14, A–38, A–45 to A–47; ITC ConfDoc 24, pp. A–90 to A–92 (describing contract negotiations between various U.S. purchasers, the plaintiff and participants in the domestic industry). The record also establishes that importers and the domestic industry produce crankshafts with similar end uses, engine types and weight ranges and supports the Commission's finding that each producer shipped its goods directly to original equipment manufacturers. *See, e.g.,* ITC Doc 164, p. A–20 and ITC ConfDoc 24, pp. A–24, table 3 and A–25, table 4.

### E

▮ After careful consideration of plaintiff's points and review of the record, the court concludes that the record contains substantial evidence in support of the Commission's determination that less-than-fair-value imports were causing material

---

**30.** Specifically, the plaintiff argues:

First, the evidence is undisputed that each crankshaft is custom designed for the specific engine design of the customer and can be used in no other engine. Quality characteristics, a key criterion for many purchasers, also differ from producer to producer.

Second, sales in the same geographic markets are relevant, if at all, only to establish the possibility of a collective hammering effect. Since the price at which a particular crankshaft is sold can have no impact on the price of any other crankshaft, the geographic hammering concept is not relevant.

Third, cumulation may be appropriate when interchangeable goods are offered for sale through common channels of distribution, in which products from various domestic and foreign sources flow together in competition with one another for sales to a common customer base. No such channels exist

here, however, since each sale is made in a customer specific bidding process for a particular engine.

The fourth test, similarity in pricing, is irrelevant because each crankshaft model is sold at a price specific to that model....

The fifth factor, simultaneous presence in the market, again highlights why cumulation is not appropriate here. As noted, competition between suppliers exists only on a sale-by-sale basis for particular crankshafts.

*Plaintiff's Memorandum, pp. 91–92.* Of course, given the "reasonable overlap" test, competition on a sale-by-sale basis would appear to be sufficient.

The plaintiff also argues end use is not a meaningful criterion. Apparently, the ITC agreed, as it was not a factor in its cumulation analysis, nor did the Commissioners choose to discuss similarity in pricing.

injury to the domestic industry. Moreover, the plaintiff has failed to persuade the court that the ITC did not proceed in accordance with law.

## VII

In view of the foregoing, that part of plaintiff's motion which seeks judgment on the ITC's record must be denied in its entirety. As for that part of plaintiff's motion which seeks judgment on the agency record of the ITA, it must be denied in part and granted in part, with the issues discussed in sections IV C and V A and B *supra* remanded to the agency for further proceedings not inconsistent with this opinion.

The ITA may have 90 days from the date hereof for such proceedings and to report the results thereof to the court, whereupon the plaintiff may have 30 days thereafter in which to respond, and the defendant may have 15 days to reply thereto.

Plaintiff's motion for judgment on the agency records denied in part and granted in part; remanded to the International Trade Administration.

So ordered.