**SONY CORPORATION OF AMERICA, Plaintiff,**

**v.**

**The UNITED STATES, Defendant,**

**and**

**International Association of Machinists, and Aerospace Workers et al., Defendants–Intervenors.**

**Court No. 88–02–00120.**

United States Court of International Trade.

April 26, 1989.

O'Melveny & Myers, Kermit Almstedt, Gary Horlick, and Jerome Lehrman, Washington, D.C., for plaintiff.

Lyn Schlitt, General Counsel, James Toupin, Asst. General Counsel, Washington, D.C., George Thompson, for the U.S. International Trade Commission, defendant.

Collier, Shannon, Rill & Scott, Paul Cullen, Laurence Lasoff, Washington, D.C., for defendants-intervenors.

OPINION

MUSGRAVE, Judge.

Plaintiff Sony Corporation of America ("Sony") moves pursuant to Rule 56.1 of the Rules of this Court for judgment on the agency record of the final determination by the United States International Trade Commission ("the Commission") in *Color Picture Tubes from Canada, Japan, the Republic of Korea, and Singapore,* Inv. Nos. 731–TA–367 through 370 (Final), USITC Pub. 2046 (1987), 52 Fed.Reg. 49, 209 (1987). The Court has jurisdiction under 28 U.S.C. § 1581(c) (1982).

BACKGROUND

On November 26, 1986 an antidumping petition was filed against imports of color picture tubes (CPTs) from Canada, Japan, the Republic of Korea, and Singapore. The Commission published notice on December 8, 1986 that it was instituting a preliminary investigation, 51 Fed.Reg. 44,130 (1986), and determined on January 22, 1987 that there was a reasonable indication that an industry in the U.S. was materially injured, or threatened with material injury, by reason of imports of CPTs from the subject countries that were allegedly being sold at less than fair value (LTFV). 52 Fed.Reg. 2459 (1987). Following an affirmative preliminary determination by the Department of Commerce ("Commerce") of sales of imports of CPTs at LTFV, 52 Fed.Reg. 24,320 (1987), the Commission instituted a final injury investigation, 52 Fed.Reg. 28,353 (1987), while Commerce conducted a final investigation of whether LTFV sales were occurring. On November 18, 1988 Commerce issued its final determination that imports of CPTs from the subject countries were being sold in the U.S. at less than fair value.

After Commerce's final determination the Commission considered whether the imports subject to the Commerce determination were a cause of material injury or threat thereof to an industry in the United States. The Commission held a public hearing on November 19, 1987 at which interested parties could provide their views, and provided an opportunity for such par-

ties to submit pre-hearing and post-hearing briefs.

Plaintiff Sony, which is a domestic producer of CPTs and an importer of CPTs from Japan that were subject to the final affirmative LTFV determination, entered an appearance as a party to the Commission's investigation, but did not submit a pre-hearing brief or appear at the hearing. Sony did, however, subsequently submit a post-hearing brief in which it raised the arguments that: (a) its picture tubes constitute a separate like product or, alternatively, (b) its imported CPTs should be excluded from any affirmative injury determination because they occupy a "discrete and insular" market segment.

The Commission issued a final affirmative injury determination on December 22, 1987. 52 Fed.Reg. 49,209 (1987). The findings of the Commission were published in *Color Picture Tubes from Canada, Japan, the Republic of Korea, and Singapore,* Inv. Nos. 731–TA–367–370 (Final), USITC Pub. 2046 (December 1987). With regard to the like product issue the Commission concluded "that there is one domestic product—all color picture tubes." *Id.* at 6. Accordingly, the Commission determined that there is one domestic industry, consisting of the six U.S. producers of CPTs. *Id.* Through its investigation the Commission concluded that the domestic industry had been materially injured and that the imported CPTs in question were the cause of this injury. Consequently, the Commission made a final affirmative injury determination. 52 Fed.Reg. 49, 209 (1987).

After the Commission issued its final determination Commerce issued an antidumping duty order on CPTs imported from Japan. 53 Fed.Reg. 430 (1988). The final antidumping duty margin applicable to plaintiff was the "all others" weighted average rate of 27.93 percent. 53 Fed.Reg. 430, 431 (1988).

### *Questions Presented*

Plaintiff presents two questions for review. First, whether there is substantial evidence on the record to support the Commission's determination to include Sony's Trinitron color picture tube (Trinitron tube) in the like product finding with "all color picture tubes", instead of as a separate like product. Second, whether the Trinitron tube should have been excluded from the Commission's final affirmative injury determination on the grounds that it occupies a "discrete and insular segment of the market" not in competition with other CPTs.

### *Standard of Review*

In reviewing challenges to administrative reviews this Court must sustain the agency's determination unless it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1982). *See Seattle Marine Fishing Supply Co. v. U.S.,* 12 CIT ——, 679 F.Supp. 1119, 1125 (1988). Substantial evidence has been held to be more than a "mere scintilla", but sufficient to reasonably support a conclusion. *Ceramica Regiomontana, S.A. v. U.S.,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd,* 810 F.2d 1137 (Fed. Cir.1987).

Because a reviewing court must accord due weight to an agency's interpretation of a statute it administers, this Court will defer to the agency's interpretation, provided it is "sufficiently reasonable". *See American Lamb Co. v. U.S.,* 785 F.2d 994, 1001 (Fed.Cir.1986). As stated in *Matsushita Electric Industrial Co., Ltd. v. U.S.,* 750 F.2d 927, 933 (Fed.Cir.1984), "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."

## DISCUSSION

1. *Whether there is substantial evidence on the record to support ITC's determination to include Sony's Trinitron color picture tube in the like product finding with all color picture tubes, instead of as a separate like product.*

Under the antidumping statute the Commission is charged with determining the presence of a reasonable indication that

(1) An industry in the United States—

(A) is materially injured, or

(B) is threatened with material injury, or

(2) the establishment of an industry in the United States is materially retarded, by reason of imports of the merchandise which is the subject of the investigation by the administering authority ... 19 U.S.C. § 1673b(a)(1) and (2) (1982).

"Industry" is defined in 19 U.S.C. § 1677(4)(A) (1982 and Supp. V 1987) as "the domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product." "Like product" is defined in turn as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation...." 19 U.S.C. § 1677(10) (1982). As indicated in the legislative history of the Trade Act Agreements of 1979, the like product standard should not be interpreted in "such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that the product and article are not 'like' each other." S.Rep. No. 96–249, 96th Cong., 1st Sess. 90–91 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 476, 477.

In sum, the Commission "determines what domestic industry produces products like the one in the class defined by ITA and whether that industry is injured by the relevant imports." *Algoma Steel Corp., Ltd. v. U.S.*, 12 CIT ——, 688 F.Supp. 639, 644 (1988), *aff'd*, 865 F.2d 240 (Fed.Cir. 1989).

In the instant case the imported good with respect to which Commerce had made an affirmative determination was color picture tubes. Thus, in determining whether or not an industry in the U.S. was materially injured, or threatened thereby, the Commission had to consider what product in the U.S. is "like" the imported color picture tubes. In its determination the Commission concluded that there was only one like product; namely, all color picture tubes. Plaintiff argues that this determination is not supported by substantial evidence on the record, as Sony's Trinitron CPT is not "like" any other CPT.

Implicit in plaintiff's argument is that there are two CPT industries in the U.S., one consisting of Sony's Trinitron, the other consisting of all other domestic manufacturers of CPTs. Plaintiff argues that because the Trinitron tube utilizes a unique color picture tube technology and because the Trinitron tube is *not interchangeable* with other color picture tubes, the Trinitron does not perform the same function as other CPTs and is therefore not "like" other CPTs.

Defendant, and defendant-intervenor, on the other hand, argue that there is substantial evidence on the record to support the Commission's finding that all CPTs "have the same general appearance and the same end uses" and that all CPTs "generally share the same distribution process", and further, that "all picture tubes, regardless of size, are made of the same essential materials and perform the same function." (Defendant's Brief at 12; List 1, Doc. No. 201 at 5.) Defendant further argues that the similarities between all CPTs, including Sony's, "vastly outweigh" the differences asserted by plaintiff and that the Commission's conclusion was reasonable and is supported by substantial evidence on the record.

a.) CPT TECHNOLOGY

The record reflects that all CPTs subject to the investigation are cathode ray tubes that convert a video signal into a visual color display. (List 1, Doc. No. 126 at A–6.) The color display is produced by an electron gun which generates beams of electrons which are deflected onto the inside faceplate of the tube. (*Id.*) The inside faceplate is covered with red, blue, and green phosphor dots; light is created by the electron bombardment of those phosphor dots. (*Id.*) The intensity of the light is controlled by the video signal impressed on the gun, which in turn controls the number of electrons emitted. (*Id.*) This describes generally the essential common characteristics of all CPTs, including the Trinitron tube. The primary difference be-

tween the Trinitron and all other CPTs is in the color selecting mechanism, which allows an electron beam to strike only one of the red, blue, or green phosphor dots. (List 1, Doc. No. 161, at 13.) Most CPTs use a "shadow mask", a thin sheetmetal plate with thousands of tiny slots. (*Id.*) The shadow mask is positioned behind the faceplate in such a fashion that the electron beams emitted by the electron gun pass through the slots at a precise angle so as to strike only one of the phosphor dot colors, while the other two are "shadowed". (*Id.* at 13, 14; List 1, Doc. No. 126 at A–6, A–7).

Sony uses an "aperture grille" rather than a shadow mask as its color selecting mechanism. (List 1, Doc. No. 161 at 14.) The aperture grille is a steel sheet with a series of continuous vertical slits which serve the same purpose as the slots in the shadow mask. Thus, the shadow mask and the aperture grille serve the same purpose and function; both are color selection mechanisms which channel the electron beams emitted by the electron gun to the phosphor dots located on the inside of the faceplate.

A second difference between the Trinitron and the conventional CPT is in the electron gun, referred to above. Whereas a CPT which uses a shadow mask uses three electron guns, each of which emits a separate beam, the Trinitron uses one electron gun to emit all three beams. (*Id.* at 11, 12.) Again, while it is clear that the use of one electron gun is different from the use of three guns, the fact remains that all CPTs require an electron gun(s) to generate electron beams.

The third asserted difference concerns the screen or faceplate, which is found on all CPTs. The faceplate is a thick glass plate which is attached to a "funnel" which forms the body of the CPT. Most CPTs have rounded corners and a convex faceplate. (*Id.* at 15.) Some have "full square" screens, with square corners and a nearly flat faceplate. (List 1, Doc. No. 126 at A–8 n. 6.) The Trinitron tube has a cylindrically shaped faceplate. (List 1, Doc. No. 161 at 16.) However, the different shape of the faceplates does not outweigh the underlying similarities between the various screens, nor their common function, which is to display a color image.

b.) CPT MANUFACTURING PROCESS

Plaintiff alleges certain differences in the production process of conventional CPTs as compared to the Trinitron, so as to make the Trinitron "unlike" other CPTs.

A CPT is constructed using four basic components: a faceplate, a shadow mask (or aperture grille in the Trinitron) [1], a funnel, and an electron gun. (List 1, Doc. No. 126 at A–9.) The faceplate is a thick glass plate which is designed to reduce radiation exposure to the viewer. The funnel is a glass casing which is bonded to a panel to form the body of the tube; it is designed to mate with the faceplate and to support the mounting of the electron gun. The electron gun is an assembly of stainless steel stampings (called grids) which emits beams of electrons that are magnetically deflected to scan the inside of the faceplate. (*Id.* at A–9, A–10.)

Plaintiff points to two differences in the production process of its CPT as compared to a conventional CPT.[2] The first is in the manufacture of the color selecting mechanism. This process begins usually with the production of the shadow mask, which involves the etching of thousands of slots or holes into a thin metal sheet. Once the mask has been etched it is annealed to a soft state and formed to fit the contour of the frame to which it is mounted so as to create the mask assembly. (*Id.*)

The Trinitron aperture grille is similarly produced from a metal sheet that is etched to form slits in the grille. The grille is then put under compression and assembled to a frame. After releasing the frame compression, the slits in the grille are kept rigid with high tension. This tension system is patented and is used in the produc-

1. The difference between the shadow mask and aperture grille has been described above.

2. Plaintiff does not assert any differences in the production process involving the faceplate or the funnel.

tion of only the Trinitron aperture grille. (List 1, Doc. No. 161 at 14, 15).

The second difference asserted by plaintiff involves the cathode design of the electron gun. The Trinitron uses a cathode design whereby the three cathodes are "unitized"—mounted on one ceramic disk. (*Id.* at 19.) In addition, the Trinitron electron gun incorporates a "divider" mechanism to divide the voltage between the high voltage needed to generate the electrons and the "convergence voltage" required to deflect the two side beams to the center of the screen. Plaintiff states that the conventional CPT does not require such a "divider". (*Id.*)

Defendant does not dispute the two differences cited by plaintiff and discussed above. However, defendant states that these differences "pale compared to the essential similarities" in the production process of all CPTs. (Defendant's brief at 20.) All CPTs, for example, use the same production process in the production of the faceplate. With respect to the color selecting mechanism defendant asserts that both are essentially metal screens in which light admitting openings are etched (slits in the aperture grille and slots in the shadow mask) and which are placed under pressure and attached to a frame. As for the manufacture of the electron gun, defendant states that the differences cited by plaintiff do not affect the essential similarity among all electron guns; namely, the inclusion of cathodes that emit electrons.

Plaintiff repeatedly asserts in its brief that the Trinitron tube is "unique" and that it is not interchangeable with other color picture tubes. As was discussed above, however, the fact that there are certain differences between the Trinitron tube and other CPTs does not mean that the Trinitron is not "like" other CPTs within the meaning of the relevant statutes. Nor is it disputed that the end use, i.e. television viewing sets, is the same for Trinitron CPTs as for other CPTs.

After a careful examination of the record the Court finds that there is substantial evidence in the record to support the Commission's determination to include the Trinitron color picture tube in the like product finding with all other picture tubes.

2. *Whether the Trinitron tube should have been excluded from the ITC's final affirmative injury determination on the grounds that it occupies a "discrete and insular segment of the market", not in competition with other CPTs.*

Plaintiff's second argument is that even if the Trinitron tube was properly included in the "like product" finding, it should have been excluded from the ITC's final affirmative injury determination since it avers the evidence on the record establishes that the Trinitron tube occupies a "discrete and insular segment of the market", not in competition with other color picture tubes. Plaintiff does not, however, cite any statutory basis, nor does it appear that it can, for this proposition.

The statute requires that the Commission make its determination by considering the imports for which Commerce has made a final affirmative determination of sales of less than fair value.

As noted above, the Commission, in making its injury determination, is required to consider the effect on the domestic industry of "imports, or sales (or the likelihood of sales) for importation, of *the merchandise with respect to which the administering authority has made an affirmative determination* ..." 19 U.S.C. § 1673d(b)(1) (1982 and Supp. V 1987) (emphasis added).

19 U.S.C. § 1673 (1982 and Supp. V 1987), provides:

If—

(1) the administering authority determines that *a class or kind of foreign merchandise* is being, or is likely to be, sold in the United States at less than its fair value, and

(2) the Commission determines that—

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of *that merchandise* or by reason of sales (or the likelihood of sales) of *that merchandise* for importation,

then there shall be imposed an antidumping duty ... (emphasis added).

Because Sony's imports were part of the class or kind of merchandise for which Commerce had made an affirmative determination, the Commission was required to include such imports in its injury investigation. As noted in *Algoma Steel Corp., Ltd. v. U.S.*, 12 CIT ——, 688 F.Supp. 639, 644 (1988), *aff'd*, 865 F.2d 240 (Fed.Cir. 1989), "in applying [19 U.S.C. § 1673] ITC does not look behind ITA's determination as to which merchandise is in the class of merchandise sold at LTFV."

Plaintiff correctly states that ITC has authority to make "like product" determinations that are narrower in scope than Commerce's "class or kind" determination. *See Badger-Powhatan, Div. of Figgie Int'l, Inc. v. U.S.*, 9 CIT 213, 608 F.Supp. 653 (1985) (seven industries, two of which were injured, found to exist within one class or kind of merchandise). This point, however, is not relevant to plaintiff's assertion that the Trinitron CPT should be excluded from ITC's injury determination because it occupies a discrete and insular segment of the market. The fact is that the Commission determined that there is only one "like product"—and therefore one industry—within the class or kind of merchandise determined by Commerce to be sold at less than fair value. Once the Trinitron was found to be a "like product", the Commission could, and indeed was required by statute to, include it in its injury determination.

Plaintiff does point out, and defendant and defendant-intervenor recognize, that the Commission has in the past indicated that it has the authority in certain limited circumstances to provide an exclusion from its injury determination, although this position has not been asserted by the Commission since 1984. It is significant, however, that in the few cases in which the Commission did provide an exclusion, it was in the context of section 751(b) revocation investigations (19 U.S.C. § 1675(b)) where outstanding countervailing or antidumping duties were already in place. In *Synthetic L-Methionine from Japan*, Inv. No. 751-TA-4, USITC Pub. 1167 (July 1981), for example, the Commission considered the effect on the domestic industry of a partial revocation of an outstanding antidumping duty order. The Commission determined that no industry in the U.S. would be injured or was threatened with injury by reason of the imports in question, and so decided to modify the existing order so as to exclude synthetic L-methionine from Japan. *Id.* at 3. Importantly, however, the Commission stated that through its review of the record of the original investigation, it was convinced that the product in question was not within the scope of that investigation. *Id.* at 13 n. 35. Such is not the case in the instant action.

In *Salmon Gill Fish Netting of Manmade Fibers from Japan*, Inv. No. 751-TA-11, USITC Pub.1921 (December 1986), the Commission decided to revoke a portion of an antidumping order concerning fish nets and netting of manmade fibers from Japan. Petitioners in that investigation sought the removal of duties from salmon gill fish netting rather than from all fish netting. As noted by the Commission, it was justified in limiting the scope of the investigation as "[s]ection 751(c) contemplates section 751 investigations that are more limited in scope than the order subject to review as it allows the administering authority to revoke a countervailing duty or antidumping order 'in whole or in part'." *Id.* at 9.

In sum, plaintiff can provide no statutory support for its request for its exclusion from the Commission's injury determination, nor can plaintiff cite any instance in which the Commission has done so in an original Title VII investigation.

## CONCLUSION

For the foregoing reasons the Court denies plaintiff's motion for judgment on the agency record and affirms the Commission's final determination in *Color Picture*

*Tubes from Canada, Japan, the Republic of Korea, and Singapore,* 52 Fed.Reg. 49,209 (1987).

JUDGMENT

This case having been submitted for decision and the Court after deliberation, having rendered a decision therein; now in conformity with that decision,

IT IS HEREBY ORDERED: that plaintiff's motion for judgment based upon the administrative record is denied and this action is hereby dismissed.