**Slip Op. 01-35**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
CHEMETALS, INCORPORATED, and              :
                                          :
KERR-MCGEE CHEMICAL LLC,                   :
                                          :
          Plaintiffs,                     :
                                          :
     v.                                   :
                                          :   Court No. 99-12-00741
THE UNITED STATES,                        :
                                          :        **Public**
          Defendant,                      :        **Version**
                                          :
          and                             :
                                          :
TOSOH HELLAS A.I.C.,                       :
                                          :
          Defendant-Intervenor.           :
_____:

[ITA's antidumping determination affirmed.]

Dated: March 30, 2001

Gardner, Carton & Douglas LLC (W.N. Harrell Smith, IV), and
Squire, Sanders & Dempsey, LLP (Ritchie T. Thomas) for
plaintiffs.

Stuart E. Schiffer, Deputy Assistant Attorney General, David M.
Cohen, Director, Commercial Litigation Branch, Civil Division,
United States Department of Justice (Erin E. Powell), Augusto
Guerra, Office of General Counsel, United States Department of
Commerce, of counsel, for defendant.

Weil, Gotshal & Manges, LLP (A. Paul Victor and J. Scott Maberry)
for defendant-intervenor.

## OPINION

**RESTANI, Judge:** This matter is before the court on a motion

for judgment on the agency record pursuant to USCIT Rule 56.2,

brought by Kerr-McGee Chemical LLC and Chemetals, Inc.
(collectively, "Plaintiffs"), the petitioners in the underlying
antidumping administrative review.  At issue is Electrolytic
Manganese Dioxide from Greece, 64 Fed. Reg. 62,169 (Dep't comm.
1999) (final admin. rev.) [hereinafter "Final Results"].
Plaintiffs contest the selection of home market sales for price
comparison purposes.  Plaintiffs also contend that inventory
carrying costs should not have been included in calculating
constructed export price ("CEP").

## JURISDICTION & STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c)
(1994).  In reviewing final determinations in antidumping duty
investigations and reviews, the Court will hold unlawful those
agency determinations that are unsupported by substantial
evidence on the record, or otherwise not in accordance with law.
19 U.S.C. § 1516a(b)(1)(B)(i).

## FACTUAL & PROCEDURAL BACKGROUND

During the period of review ("POR"), April 1, 1997 through
March 31, 1998, Tosoh Hellos AIC ("Tosoh") sold only Electrolytic
Manganese Dioxide ("EMD"), an intermediate product used in the
production of dry cell batteries.  During this period, Tosoh
produced and exported EMD to the United States, though of a grade

different from that sold in the home market.[1]

In March of 1989, Commerce determined that EMD from Greece was being sold at less than fair value in the United States. Electrolytic Manganese Dioxide from Greece, 54 Fed. Reg. 8,771 (Dep't Comm. 1989) (final determ.) ["EMD from Greece"]. In EMD from Greece, Commerce determined that zinc-chloride and alkaline grade EMD were "similar" merchandise because "the two [grades] of EMD are produced in the same production process and differ only in their final finishing"; there was minimal cost difference between the products; and both grades were used in the production of dry-cell batteries. Id. at 8773. Commerce also determined that "respondent's combined home market sales of alkaline and zinc-chloride grade EMD are adequate as a basis of comparison since these sales exceed five percent of sales of that merchandise to third countries." Id.

Plaintiffs sought judicial review of the determination in EMD from Greece regarding the issues of product comparability and home market viability. Kerr-McGee Chem. v. United States, 14 CIT 422, 741 F. Supp. 947 (1990). There, the court affirmed Commerce's viability analysis and its determination that the two

_____

[1] These included the following grades:  (1) a [        ] grade EMD manufactured using one subtype of an input, namely [              ] and (2) [              ] grade EMD manufactured using another subtype of an input, namely [          ].  In the period of review, Tosoh sold in the home market only the [              ] EMD and exported to the United States only the [        ] grade EMD.

grades of EMD were "similar" under the then-applicable like product provision of the statute.  Id., 14 CIT at 426-31, 741 F. Supp. at 952-56.

On April 29, 1998, THA requested that Commerce initiate the administrative review of EMD from Greece.  Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part, 63 Fed. Reg. 29,370 (Dep't Comm. 1998).  Commerce found that the home market product qualified as a "foreign like product," that the home market was viable pursuant to the five percent viability test, and that a "particular market situation" did not exist to warrant departure therefrom.  Final Results, 64 Fed. Reg. at 62,170-73. Plaintiffs appealed the Final Results to this court.

On May 17, 2000, the United States International Trade Commission published the results of its five-year (sunset) review of the antidumping orders against EMD from Greece and Japan, finding that revocation of the antidumping duty orders "would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time."  Electrolytic Manganese Dioxide from Greece and Japan, 65 Fed. Reg. 31,348, 31,348 (Int'l Trade Comm'n 2000) (sunset rev.).  On May 31, 2000, Commerce revoked the antidumping orders against EMD from Greece and Japan, effective January 1, 2001.  Electrolytic Manganese Dioxide from Greece and Japan, 65

Fed. Reg. 34,661 (Dep't Comm. 2000) (revocation).

Notwithstanding the revocation, Plaintiffs maintain the appeal of

the Final Results.[2]


## DISCUSSION


    Plaintiffs challenge the Final Results on three grounds.

First, Plaintiffs claim that Commerce's determination of "foreign

like product" under 19 U.S.C. § 1677(16)(B) is not supported by

substantial evidence and is otherwise not in accordance with law.

Second, Plaintiffs contend that (a) the low volume of U.S. sales

relative to sales worldwide warrants a departure from application

of the test for home market viability under 19 U.S.C. §

1677b(a)(1), and (b) a "particular market situation" renders

Tosoh Greece's home market sales an inadequate basis for

comparison.  Third, Plaintiffs claim that inventory carrying

costs were associated with economic activities occurring in the

United States and therefore should have been included in

calculating constructed export price.

## I.  Foreign Like Product

    In the Final Results, Commerce concluded that the EMD Tosoh

sold in Greece is a "foreign like product" on which normal value

---

    [2] No party has argued that the revocation rendered the Final
Results moot.  Whether duties are owed for the review period at
issue remains an open issue.

can be based under 19 U.S.C. § 1677(16)(B).[3]  64 Fed. Reg. at

62,171.  Plaintiffs argue that this conclusion is not supported

by substantial evidence and is contrary to law because the EMD

sold in Greece is (1) not "like [the exported product] in

component material or materials and in the purposes for which

used"; and (2) not "approximately equal in commercial value to

[the exported product]," as required under 19 U.S.C. §

1677(16)(B)(ii) and (iii).

_____

[3]  19 U.S.C. § 1677(16) reads in relevant part:

(16) Foreign like product

The term "foreign like product" means merchandise in the
first of the following categories in respect of which a
determination for the purposes of part II of this subtitle
can be satisfactorily made:

(A) The subject merchandise and other merchandise which is
identical in physical characteristics with, and was produced
in the same country by the same person as, that merchandise.

(B) Merchandise--
(i) produced in the same country and by the same person as
the subject merchandise,
(ii) like that merchandise in component material or
materials and in the purposes for which used, and
(iii) approximately equal in commercial value to that
merchandise.

* * *

A.  Component Materials

In the Final Results, Commerce determined that the EMD sold in Greece is "like [the exported product] in component material or materials" pursuant to 19 U.S.C. § 1677(16)(B)(ii) based on several findings.[4]  Commerce found that "the most important component materials (i.e., manganese ore, heavy oil, sulfuric acid, etc.) of the U.S. and home market products are the same." Final Results, 64 Fed. Reg. at 62,170.  Commerce recognized that the home market product is manufactured using a different subtype of a particular input than that used to manufacture the subject merchandise, but found that "the difference [between subtypes of the input] is not a difference in component materials but rather a difference in the equipment used in the manufacturing processes."  Id.  Commerce also dismissed the fact that Tosoh itself had classified the subtype of input used in manufacturing the home market product as a "raw material," as "this designation was solely for accounting purposes because the useful life of the equipment is less than one year."  Id.

Plaintiffs argue that Commerce's determination is not supported by substantial evidence for two reasons.  First, Plaintiffs argue that contrary to Commerce's findings, the input

_____

[4] Commerce and Tosoh concede that the products are not identical pursuant to § 1677(16)(A).

at issue is also an "important" material because it is necessary for the manufacture of the home market EMD and constitutes a substantial percentage of total component material value. Second, Plaintiffs maintain that unlike the subject merchandise, the home market EMD is manufactured using an input subtype that, because it is consumed in the production process, is expensed as a variable cost and is therefore more properly characterized as a component raw material.

Plaintiffs do not establish that Commerce's determinations are not supported by substantial evidence. Substantial evidence "must be enough reasonably to support a conclusion." Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986) (citations omitted), aff'd, 810 F.2d 1137 (Fed. Cir. 1987). Under 19 U.S.C. § 1677(16)(B), Commerce is not required to find that the products are identical as under 19 U.S.C. § 1677(16)(A).[5] Here, the record shows that (1) except for the input at issue, the materials used in producing the two grades of EMD are identical; (2) both EMD grades have the same physical structure; and (3) meet the same minimum chemical property specifications. Viability & Comparability Mem. (Apr. 29, 1999), at 3, C.R. Doc. 33, Def.'s App., Tab 1, at 7;

---

[5] Even under 19 U.S.C. § 1677(16)(A), exact identity is not required. See Pesquera Mares Australes Ltda. v. United States, No. 98-08-02680, 2000 WL 766520, at *3-4 (Ct. Int'l Trade June 5, 2000).

Questionnaire Response (July 7, 1998), at A-17 to A-18, C.R. Doc. 1, Pl.'s App., Tab 4A, at 1-2. Plaintiffs do not dispute any of these facts. Plaintiffs concede that the input subtype that is used in manufacturing the subject merchandise also can be used to produce the home market EMD. Rather than deeming the input unnecessary or unimportant, Commerce reasonably determined that the difference in subtypes alone was not sufficient to outweigh the factual findings in favor of "foreign like product." See Sony Corp. v. United States, 13 CIT 353, 357-59, 712 F. Supp. 978, 981-83 (1989) (upholding International Trade Commission's determination that similarities in physical characteristics and production processes outweigh differences asserted by plaintiff). Therefore, even if the subtype of input at issue that was used in manufacturing the home market EMD were properly considered a "component," Commerce's determination of "like in component materials" is supported by substantial evidence.

Plaintiffs' second argument – that the designation of an item for accounting purposes should determine characterization under § 1677(16)(B)(ii) – also lacks merit. Characterization of an item for accounting purposes does not dictate how the item should be classified for the purposes of finding "like in component materials" under 19 U.S.C. § 1677(16)(B)(ii). Rather, the physical characteristics underlying the accounting designation are relevant to, but not dispositive of, Commerce's

determination in this regard. For example, in <u>Silicomanganese</u> <u>from the People's Republic of China</u>, 65 Fed. Reg. 31,514 (Dep't Comm. 2000) (final admin. rev.), Commerce recognized that an item was not physically incorporated within the final product and, thus, would not normally be considered a direct material input (typically classified as "process materials" that are often included in factory overhead as "consumables"). <u>See</u> <u>Issues &</u> <u>Decision Mem.</u>, at Part IV, cmt. 1. Nevertheless, Commerce concluded there that for the purposes of determining "foreign like product," the item was more properly characterized as a cost element separate from factory overhead, and therefore a component part, because it represented a "significant portion of the cost of the finished product." <u>Id.</u> Similarly, in <u>Saccharin from the</u> <u>People's Republic of China</u>, 59 Fed. Reg. 58,818, 58,823-24 (Dep't Comm. 1994) (final determ.), though respondent characterized a particular item as "factory overhead," Commerce deemed it a direct material input, and therefore a component for the purposes of determining "foreign like product," because it was specially processed, packaged, and shipped to customers and because it was required for a particular segment of the production process for which a substitute was not available.

Commerce in this case properly looked at the physical properties underlying Tosoh's accounting designation and determined that such designation was not determinative. <u>See</u>

<u>Viability & Comparability Mem.</u>, at 6, Def.'s App., Tab 1, at 6.

As Tosoh explained to the Department, the [


] is part of the finished product only insofar as "it

cannot be totally eliminated in the washing process."  <u>See</u> <u>March</u>

<u>10, 1999 Submission</u>, at 4, C.R. Doc. 29, Def.'s App., Tab 3, at

1. Based on these findings, Commerce concluded that the input at

issue was not a component for the purpose of determining "foreign

like product."

B.  <u>Purpose for which Used</u>

   Commerce concluded that the home market EMD and the subject

merchandise did not differ in the purpose for which they are

used.  This conclusion was based on a finding that "Tosoh's

customers use both types of EMD grades as a cathode material,

which provides the electric charge needed for a battery to

perform."  <u>Final Results</u>, 64 Fed. Reg. at 62,171.  Plaintiffs

first argue that the batteries that contain the home market EMD

cannot be used for the same purposes as the batteries that

contain the subject merchandise. Plaintiffs further argue that

the EMD sold in the home market was used *primarily* as an *additive*

or an "enriching agent" to natural manganese dioxide (NMD) in

inexpensive battery cells, while the subject merchandise is

solely used in premium, high-drain AA batteries as the cathode

material itself.  To support their argument, Plaintiffs cite

evidence that the EMD Tosoh sold in the home market is of a lower

quality and sells for a lower price than the EMD exported by

Tosoh to the United States.

First, under 19 U.S.C. § 1677(16)(B)(ii), Commerce need only

find that the home market product is "like" the subject

merchandise in the purpose for which it is used; it need not find

exact identity of purpose, nor must it find like purpose for the

device (here, batteries) into which the product is ultimately

incorporated.  Koyo Seiko Co. v. United States, 66 F.3d 1204,

1210 (Fed. Cir. 1995) ("[I]t is not necessary to ensure that home

market models are technically substitutable, purchased by the

same type of customers, or *applied to the same end use* as the

U.S. model.") (emphasis added).   See also Sony Corp., 13 CIT at

359, 712 F. Supp. at 983 (rejecting plaintiff's contention that

lack of interchangeability between products defeats a finding of

"similar merchandise"); Certain Forged Steel Crankshafts from the

United Kingdom, 56 Fed. Reg. 5975, 5977 (Dep't Comm. 1991) (final

admin. rev.) ("Under [19 U.S.C. § 1677(16)(B)] end-use is a

factor only when the end-use pertains to the product under

investigation itself, not to the product into which it is

incorporated."), aff'd, United Eng. & Forging v. United States,

15 CIT 561, 565-67, 779 F. Supp. 1375, 1380-82 (1991).  Thus,

that the batteries into which the respective grades of EMD were

incorporated had different end-uses is not determinative of whether the grades of EMD themselves may properly be considered "like in purposes for which used."  Second, that the home market EMD was used by some customers as an additive does not negate the fact that, as Plaintiffs concede, approximately 50% of the EMD sold in the home market was used as the cathode material itself, the same purpose for which the subject merchandise was used. Commerce's finding of "like" purpose is therefore supported by substantial evidence.

## C.  Commercial Value

Commerce concluded that the EMD sold in the home market is "approximately equal in commercial value to [the exported] merchandise" pursuant to 19 U.S.C. § 1677(16)(B)(iii).  Final Results, 64 Fed. Reg. at 62,171-72. Commerce based its conclusion on two findings: (1) the difference in merchandise ("difmer") fell within 20% of the total manufacturing cost of the subject merchandise, Electrolytic Manganese Dioxide from Greece, 64 Fed. Reg. 25,008, 25,009 (Dep't Comm 1999) (prelim. determ.); and (2) the sales data from a third country –  the only country selling both grades of EMD at issue during the POR – revealed an extremely low price differential between the two grades.[6]

---

[6] Commerce found that the third-country average unit U.S. dollar price per ton of the [                    ] differed from that of the [                ] sales by [          ].

Plaintiffs contend that in this case the difmer test is unusable for the purposes of determining commercial comparability. Plaintiffs also dispute the use of third country sales data.

1.   Application of the Difmer Test

Ordinarily, the difmer adjustment to normal value is used to account for the difference in cost attributable to the difference in physical characteristics between the home market product and the subject merchandise.  See 19 U.S.C. § 1677b(a)(6)(C)(ii). See also Import Administration Policy Bulletin, No. 92.2 (July 29, 1992) [hereinafter "Policy Bulletin"]; Bethlehem Steel Corp. v. United States, 2000 WL 726931 at *4 (Ct. Int'l Trade 2000). "[I]f the difmer adjustment . . . exceeds twenty percent, Commerce will not make a finding that the home-market product is reasonably comparable to the exported good, unless it can explain how the comparison is nevertheless reasonable." Mitsubishi Heavy Industries, Ltd. v. U.S.,112 F. Supp. 2d 1170, 1171 (Ct. Int'l Trade 2000).  In the instant case, Commerce found a difmer within this 20% guideline, as calculated on the basis of variable manufacturing costs.[7]   Final Results, 62 Fed. Reg. at 62,170.

---

Commercial Value Mem. (July 27, 1999), at 2, C.R. Doc. 47, Pl.'s App., Tab 15-A, at 2 ["Commerical Value Memo"].

[7] Tosoh reported a difmer of [
], which is  [          ] of the total manufacturing cost of the subject merchandise, [                              ].  Tosoh October 29, 1998 Reply Letter, at 17, C.R. Doc. 19, Tosoh's App.,

Commerce used the results of this calculation to support its conclusion that the home market product and the subject merchandise were "commercially comparable" for the purposes of determining "foreign like product" under 19 U.S.C. § 1677(16)(B)(iii).

Plaintiffs first argue that the difmer test cannot be applied to support a finding of commercial comparability where the difmer is "distorted" by the difference in physical characteristics between the two grades of EMD. Plaintiffs contend that because the input at issue used in producing the home market product is wholly consumed, it is characterized as a variable cost, and thus factored into the difmer calculation. In contrast, because the disputed input used in producing the subject merchandise is not wholly consumed, it was not included in variable costs and was thus excluded from the difmer calculation. Consequently, Plaintiffs contend that the difmer is therefore necessarily unbalanced and unusable as support for a determination of commercial comparability. Plaintiffs also allege that Commerce was inconsistent in including as "variable costs" those costs associated with the home market input in calculating the difmer where this item had been excluded from consideration in the determination of "like in component materials" under 19 U.S.C. § 1677(16)(B)(ii).

--------

Tab F-1, at 8.

Commerce responds that it is within its discretion to use the difmer test to support its determination of commercial compatibility and the physical differences between the products are not such that the difmer test cannot be so used.  Commerce also explains that it included variable costs associated with the disputed input in the home market EMD because the difmer accounts for not just component materials but also variable factory overhead.  Final Results, 64 Fed. Reg. at 62,170.  Although the court finds Commerce's calculation methodology for the difmer somewhat questionable, see note 10 infra, Commerce's determination of commercial comparability is supported by substantial evidence.[8]

_____

[8] Tosoh Greece cites Disposable Pocket Lighters from Thailand, 60 Fed. Reg. 14,263 (Dep't Comm. 1995) (final determ.) ("Disposable Lighters") and United Engineering, 15 CIT 561, 779 F. Supp. 1375, for the proposition that in determining "foreign like product" under 19 U.S.C. § 1677(16)(B), Commerce may focus on the physical characteristics to the exclusion of commercial value.  Notwithstanding the broad language of United Engineering, we note that this argument lacks merit.  For merchandise to qualify as "foreign like product" under 19 U.S.C § 1677(16)(B), Commerce must consider all three criteria set forth therein.  See Timken Co. v. United States, 11 CIT 786, 792, 673 F. Supp. 495, 503 (1987) (remanding for a determination of whether merchandise compared was of "approximately equal commercial value").  Accord Nihon Cement Co. v. United States, 17 CIT 400, 411-12 (1993).

Furthermore, Tosoh's reliance on Disposable Lighters and United Engineering is misplaced.  In Disposable Lighters, the Department noted that

the Department places little weight on the commercial value criterion in determining what constitutes such or similar merchandise. . . .  [T]he Department focuses on the similarity of the physical characteristics. . . .  The Department's position in this regard has been upheld by the

Commerce has been granted broad discretion to devise a

methodology for determining what constitutes "similar"

merchandise. See Koyo Seiko, 66 F.3d at 1209.  Specifically, it

is within Commerce's discretion to apply the 20% difmer test in

informing its determination of commercial comparability under 19

U.S.C. § 1677(16)(B)(iii).  See SKF USA Inc. v. United States,

874 F. Supp. 1395, 1399-1400 (Ct. Int'l Trade 1995) (finding that

Commerce acted within its discretion in using the 20% difmer

adjustment cap as test for identifying similar merchandise).

Commerce is also correct that the difmer allowance normally

relies on only variable and semi-variable manufacturing expenses

in quantifying cost differences.[9]  Furthermore, Commerce did not

_____

CIT in United Engineering.

60 Fed. Reg. at 14,266.

The court in United Engineering held that the ITA was not
required to consider nonphysical criteria (such as end-use and
commercial value) in making its selection of a foreign-market
comparison model, but it has the discretion to do so.  15 CIT at
566, 779 F. Supp at 1381.  The ITA's selection in that case,
however, was under 19 U.S.C. § 1677(16)(C), not § 1677(16)(B) as
in this case or in Disposable Lighters, for that matter.  See
Crankshafts from the United Kingdom, 56 Fed. Reg. at 5977-78
("although the statute makes reference to commercial value in
section 771(16)(B), we disagree with [the] argument that this
requires the Department to consider differences in prices in
making such or similar comparisons. . . . [U]nder section
771(16)(C), the Department has the discretion to make reasonable
comparisons without regard to commercial value.").

[9] According to the Policy Bulletin:

[i]f the commercial value of the two products is
greatly different, then a comparison is not reasonable;

reject Tosoh's accounting designation of costs associated with the home market input; Commerce merely determined that for the purpose of determining similarity in component materials, such designation was not controlling.  In any event, nothing in the language of § 1677(16)(B) compels Commerce to adhere to the characterization under its § 1677(16)(B)(ii) analysis when determining commercial comparability under § 1677(16)(B)(iii), or vice versa.  Therefore, use of the difmer test in determining commercial comparability was proper.[10]

_____

> the difmer adjustment, being limited to variable manufacturing costs probably cannot fully compensate. . . . When the variable cost difference exceeds 20%, we consider that the probable differences in values of the items to be compared is so large that they cannot reasonably be compared.

The difmer is normally calculated by dividing the difference in variable production costs by the total manufacturing costs of the product exported to the United States.  Id.

[10] This is not to say that Commerce was compelled to apply the difmer test as it did or to calculate the difmer as it did. Here, the calculation includes the costs of the home market input while excluding the costs of its counterpart in the subject merchandise simply because the Policy Bulletin directs that variable and semi-variable costs factor into the difmer analysis. Commerce's findings with respect to the home market input (for the purpose of determining whether the products were "like in component materials") would have warranted exclusion of costs associated therewith when calculating the difmer, notwithstanding Tosoh's designation of such costs as variable.  Commerce is ill-advised to consider each criteria under 19 U.S.C § 1677(16)(B) in isolation.  All parties seem to accept that the difmer calculation actually showed a few percentage points difference in the wrong direction.  The difmer calculation would have been more reliable had Commerce either excluded or included the costs associated with both sub-types of corresponding inputs. Plaintiffs, however, have not requested remand for recalculation

2.  The Use of Third Country Sales

To determine comparability of commercial value, Commerce also relied on data concerning the quantity and value of two EMD grade types sold in one third-country market, [        ]. Commerce relied on sales data from this third country because it was the only market in which Tosoh sold both grades during the POR.[11]  Final Results, 64 Fed. Reg. at 62,171-72.  Based on this data, Commerce found that the two grades were priced closely enough to support a finding of commercial comparability.

Plaintiffs contend that Commerce erred in relying on data concerning third-country sales where such sales were not representative of the commercial value of the home market type EMD.  Plaintiffs argue that the third-country sales cannot represent the commercial value of the home market type EMD because the use of the EMD by the third-country customers

---

of the difmer and do not argue that the difmer would exceed 20% under either methodology suggested by the court.  Their argument is that difmer should not be calculated or used, an argument the court rejects.

[11] Commerce had requested the quantity and value of sales to each of the three largest third-country markets where it sold both types of EMD grades during the review period.  Tosoh reported that during the period of review it had only one third-country market where it sold both grades of EMD. Commerical Value Memo, at 1-2, Pl.'s App., Tab 15-A, at 1-2; Third-Country Market Submission (May 5, 1999), at 1-2, C.R. Doc. 35, Pl.'s App, Tab 3 at 1-2.

differed substantially from the uses of the EMD in the U.S. and home markets.  Plaintiffs concede that the EMD sold in the third-country market was used as the cathode material in battery manufacture, but maintain that it was not sold for use as the cathode in *dry-cell* batteries, nor as an additive for an NMD cathode, as in the U.S. and home market products, respectively. Plaintiffs contend that these different uses "may affect relevant supply/demand factors and thus its market value." Plaintiffs therefore urge that the commercial value be determined by comparing the average unit values based on *worldwide* sales of the two grades of EMD, in which case the difference in commercial value would preclude the home market EMD from being a "foreign like product."[12]

Plaintiffs' assertion that the EMD sold in the third country was not used for the same purposes as the U.S. and home market EMD is not supported in the record.  In the Commercial Value Memorandum, Commerce cited an affidavit from Tosoh's Director of Sales who stated that "during the review period, Tosoh's [third-

---

[12] Plaintiffs contend that commercial value of the type of EMD sold in the home market differs from that of the type sold in the United States by [        ], relying on Tosoh's Submission of Quantity and Value Reconciliation Letter (Dec. 9, 1998), at Exh. 1, C.R. Doc. 21, Pl.'s App., Tab 1, at 13.  This percentage is apparently based on a comparison of average unit value of each grade of EMD:   [                  ] per MT for the U.S. market EMD compared to [              ] for the home market EMD.  Plaintiffs fail to show, however, how they arrived at these underlying figures.  Furthermore, it appears that Plaintiffs calculated average unit value for the year 1997 rather than the POR.

country] customer purchased . . . EMD from Tosoh for use as a

cathode mixture in the manufacture of primary (i.e., non-

rechargeable) dry-cell batteries." Pl.'s App., Tab 15-A, at 4.

Furthermore, as stated above, the EMD sold in the home market was

not sold exclusively as an enriching agent, but also as the

cathode itself. Therefore, the court rejects Plaintiff's

invitation to engage in speculation as to what effect any

difference in use might have had on the demand and supply of the

products sold in the third country. Commerce's use of third-

country sales data was appropriate and its calculations derived

therefrom appear accurate.[13] Therefore, even though the exact

difmer calculation is questionable, Commerce's determination of

commercial comparability is supported by substantial evidence.

In sum, Commerce's determination under the three-part test of §

1677(16)(B) for determining like product is supported by

substantial evidence.

II.  Home Market Viability

In the Final Results, Commerce concluded that pursuant to 19

U.S.C. § 1677b(a)(1) the sales of EMD in the home market

constituted a viable basis for calculating normal value. 64 Fed.

---

[13] The average unit U.S. dollar prices were [          ] per metric ton for the [          ] grade EMD sales and [          ] per metric ton for the [          ] grade EMD sales, which represents a difference of about [          ]. Commercial Value Mem., at 2, Pl.'s App., Tab 15-A, at 2.

Reg. at 62,172-73.  Commerce's conclusion was supported by three findings.  First, Commerce found that the aggregate quantity of foreign like product sold in the home market was greater than five percent of the aggregate quantity of sales of the subject merchandise to the United States.[14]  Id. at 62,173.  Second, Commerce found that there was no "unusual situation" that would warrant a departure from the five percent viability test.  Id.  Third, Commerce found that there was no "particular market situation" within the meaning of 19 U.S.C. § 1677b(a)(1)(C)(iii) that would prevent a proper price comparison.[15]  Id.  Plaintiffs

---

[14] Under 19 U.S.C. § 1677b(a)(1)(C)(ii), third country sales (rather than sales in the exporting country) would be appropriate to determine normal value if "the administering authority determines that the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States . . . ."

The subparagraph further specifies that "the aggregate quantity (or value) of the foreign like product sold in the exporting country shall normally be considered to be insufficient if such quantity (or value) is less than 5 percent of the aggregate quantity (or value) of sales of the subject merchandise to the United States."  Id.  Here, Commerce found that sales in the home market constituted approximately [          ] greater than the aggregate volume of sales of the subject merchandise in the United States.  Viability & Comparability Mem., at 7-8, Def.'s Ex. 1, at 7-8.

[15] Under 19 U.S.C. § 1677b(a)(1)(C)(iii), sales in the home market may be rejected as the basis for calculating normal value if "the particular market situation in the exporting country does not permit a proper comparison with the export price or constructed export price."

contest only the second and third findings.

A.  Unusual Situation

To determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating normal value (NV), Commerce compares the respondent's volume of home-market sales of the foreign like product to the volume of U.S. sales of the subject merchandise in accordance with 19 U.S.C. § 1677b(a)(1)(C)(ii).  Under normal circumstances, if the respondent's aggregate volume of home-market sales of the foreign like product is greater than five percent of its aggregate volume of U.S. sales for the subject merchandise, the home market is deemed viable and NV may be based on home-market sales.  19 U.S.C. § 1677b(a)(1)(C).   The Statement of Administrative Action ("SAA") recognizes, however, that "in unusual situations . . . home market sales constituting more than five-percent of sales to the United States could be considered not viable."  H.R. Rep. No. 103-826, at 821, reprinted in 1994 U.S.C.C.A.N. 4040, at 4162. When a home market is deemed not viable, Commerce normally calculates NV based on sales to a viable third-country market rather than on constructed value (CV).[16]  See Certain Forged

_____

[16]   Once Commerce determines that the home market is not viable under one of the conditions in 19 U.S.C. § 1677b(a)(1)(C), Commerce may use third country sales as a basis for calculating NV, provided, however, that they themselves are deemed viable according to the following criteria in § 1677b(a)(1)(B):

(I) [the price of the foreign like product sold in such

Stainless Steel Flanges from India, 61 Fed. Reg. 14,073, 14,074

(prelim. results) (Dep't Comm. 1996).

Plaintiffs argue that there is an "unusual situation"

warranting rejection of home market sales as a basis for

calculating NV because the sales in the United States were

"negligible," such that "virtually any volume of home market

sales" would satisfy the five percent viability test.  Pl.'s Br.

at 38-39.  Plaintiffs urge that NV be based instead on EMD sales

to Switzerland because sales to that country were of sufficient

volume "to subsidize Tosoh Greece's penetration of the United

States market."  Id.

Plaintiffs' argument is without merit.  Under the pre-

Uruguay Round Agreements Act statute, viability was determined by

comparing the quantity of goods sold in the home market to those

sold in countries other than the United States.   Under the

current statute, the five percent viability test is determined by

comparing home market sales directly to U.S. sales.  The SAA

clarifies that the use of third country sales data comparator was

---

country] is representative,
(II) the aggregate quantity (or, if quantity is not
appropriate, value) of the foreign like product sold by the
exporter or producer in such other country is 5 percent or
more of the aggregate quantity (or value) of the subject
merchandise sold in the United States or for export to the
United States, and
(III) the administering authority does not determine that
the particular market situation in such other country
prevents a proper comparison with the export price or
constructed export price.

eliminated from the five percent home market viability test to
"prevent the use of 'thin' home markets as the basis for
identifying dumping."  H.R. Rep. No. 103-826, at 821, reprinted
in 1994 U.S.C.C.A.N. 4040, at 4162. The term "thin" markets
refers to situations whereby the volume of home market sales is
high in relation to third country sales such that the 5% test
would be satisfied even though the quantity of home market sales
might be extremely low in relation to U.S. sales such that a
price-to-price comparison would be unreasonable.  Thus, the
amendment eliminated the use of the third country sales data
comparator to account for the possibility of "false positive"
results in the application of the five percent viability test
that might arise therefrom.  To use Switzerland sales data
because the home market sales are somehow "thin" in comparison to
U.S. sales, as plaintiffs urge, would turn the SAA on its head.
Furthermore, the statute sets no minimum quantity of U.S. sales
that may be used in making the direct comparison to home market
sales.  Indeed, even a single entry of subject merchandise is
sufficient where such an entry is indicative of the respondent's
regular pricing practices.  See Silicon Metal from Brazil, 59
Fed. Reg. 42,806, 42,813 (Dep't Comm. 1994) (final admin. rev.)
(review based on finding that single sale "constitutes the most
accurate reflection of [respondent's] pricing practices during
the review period"). See also Fresh and Chilled Atlantic Salmon

from Norway, 62 Fed. Reg. 1430, 1432 (Dept. Comm. 1997) (final results) (review based on single sale so long as sale based on bona fide arm's length transaction). Plaintiffs have made no showing that the U.S. sales are somehow anomalous in terms of pricing, nor any other circumstances of sale that would render U.S. sales an invalid basis for comparison. Therefore, Plaintiffs have not shown on this basis that Commerce's direct comparison of U.S. sales to home market sales is not supported by substantial evidence or otherwise not in accordance with law.

### B. Particular Market Situation

Even if the five percent home market viability test may be met under 19 U.S.C. § 1677b(a)(1)(C)(ii), the use of third country sales as a basis for calculating NV may be justified where Commerce, acting in its discretion, finds a "particular market situation" in the exporting country that would preclude a proper comparison with the export price pursuant to §1677b(a)(1)(C)(iii).[17] Although the statute does not specify what constitutes such a "particular market situation," examples given in the SAA include the following: (1) a single sale in the

---

[17] Commerce is not obligated to make findings regarding a "particular market situation," as such a requirement would significantly impair the Department's ability to comply with its statutory deadlines. See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,357 (Dep't Comm. 1997) (preamble to final rule).

home market constitutes five percent of sales to the United
States; (2) government controls over prices "to such extent that
home market prices cannot be considered competitively set," and
(3) differing patterns of demand experienced in the United States
and in the exporting country.  Plaintiffs do not contend that any
of these scenarios apply to the instant case.[18]  Rather,
Plaintiffs argue a "particular market situation" exists where (1)
the physical characteristics of the home and U.S. market products
are so dissimilar that a proper difmer adjustment cannot be made,
and, alternatively, (2) home market sales are "incidental" to
Tosoh and therefore are insufficient to permit a proper
comparison with sales to the United States.[19]

Plaintiffs' first argument lacks merit.  Where Commerce
finds that a proper difmer adjustment cannot be made, it may
choose not to use home market sales as a basis for calculating
NV.  For example, in Large Newspaper Printing Presses and
Components thereof, whether Assembled or Unassembled, from Japan,

---

[18] Tosoh had multiple home market sales during the POR.  See
Questionnaire Response, at Exh. B-1, C.R. Doc. 1, Tosoh's App.,
Tab B-1 at 17.

[19] Plaintiffs further argue that proper price-to-price
comparison is impossible because the home market use of EMD was
"unusual" and likely to have adverse effects on the price.
Because the court has rejected this argument above, see supra at
sections I.B & I.C.2., Plaintiffs' argument that these
circumstances present a "particular market situation" also must
fail.

61 Fed. Reg. 38,139, 38,146-47 (Dept. Comm. 1996) (final determ.), Commerce found that use of home market sales as a basis for calculating NV was inappropriate and instead opted to use constructed value (CV) where "the degree of unique customization for customers made the difference-in-merchandise adjustment for product price matching potentially . . . complex."  Thus, Commerce's finding in Large Newspaper Printing Presses was based on the impracticability of comparing prices set according to the specifications of individual customers.  In contrast, EMD is a commodity, the grades of which are established according to industry specifications and the prices of which are not determined according to customer specifications or requested modifications.  Because there is nothing in the record to suggest that the sales of the home market EMD did not reflect prevailing market prices for the commodity, Plaintiffs' argument that home market sales are not viable pursuant to 19 U.S.C. § 1677b(a)(1)(C)(iii) must fail.

Plaintiffs' second argument also lacks merit.  Plaintiffs contend that the home market sales are "incidental" because they were for a "low value use" and therefore "hav[e] no material effect on a company's profitability."  Pl.'s Br. at 44.  The term "incidental" for the purposes of determining whether a "particular market situation" exists, however, refers not to the value of the sales or the quality of the goods sold, but to

whether the sales were made under normal market circumstances.
For example, in <u>Fresh Atlantic Salmon from Chile</u>, 63 Fed. Reg.
31,411, 31,418 (Dep't Comm. 1998) (final determ.), Commerce found
home market sales to be incidental where the respondent sold
substandard (i.e., "reject" or "industrial") grade sales on an
"as available" basis and without standard quality guarantees to
offset losses that would have been sustained by disposal of the
off-market merchandise.  The sales in <u>Salmon from Chile</u>,
therefore, can hardly be said to have been made under conditions
that would reflect normal market prices.

Here, in contrast, the home market EMD was sold for use in
batteries that were of a lower quality than those into which the
subject merchandise was incorporated.  It does not follow,
however, that the home market EMD sales did not reflect
prevailing market prices.  In fact, the record reveals evidence
that the home market EMD was sold under normal market
circumstances: the home market EMD was sold to a regular customer
at prices set in arm's-length transactions and under a standard
guarantee.  <u>Questionnaire Response</u> at Exhs. A-3, B-1, Tosoh's
App., Tab B-1, at 7, 9, 17; <u>Quantity and Value Reconciliation
Letter</u>, at Exh. 4, Tosoh's App., Tab C.  In addition, the home
market EMD met basic minimum technical standards.  <u>Questionnaire
Response</u>, at A-21, Exhs. A-3, A-19, A-20, Pl.'s App., Tab 4A, at
5, & Tosoh's App., Tab B-1, at 7, 9, 12-16.  Therefore,

plaintiffs' contention that the home market sales were incidental and thus not indicative of market prices fails.


III. Inventory Carrying Costs

Plaintiffs contend that Commerce erred in including Tosoh's inventory carrying costs in calculating normal value as a constructed export price offset adjustment while disregarding them in calculating CEP.[20]  See Pl.'s Br., at 47; Final Results, 64 Fed. Reg. at 62,174.  Specifically, Plaintiffs claim that although the inventory carrying costs were incurred outside the United States, they were incurred in connection with sales to an unaffiliated purchaser in the United States.  Because such sales were for the benefit of the unaffiliated purchaser, Plaintiffs argue, they are therefore "associated with" commercial activity in the United States and deductible from CEP under 19 C.F.R. 351.402(b).[21] Pl.'s Br. at 47-48.  Plaintiffs concede, however, that disposition of this issue in their favor would have a de

---

[20] "Constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d) of § 1677a.  19 U.S.C. § 1677a(b).

[21] The SAA provides that CEP is calculated to be "as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers."  SAA at 823, reprinted in 1994 U.S.C.C.A.N. at 1463.

minimis effect on the dumping margin.[22]   Therefore, the court
need not resolve whether Commerce erred in the assumptions
underlying its calculations as the issue is moot given the
court's other holdings.

---

    [22] Commerce found a weighted average margin of 0.00 percent
for Tosoh for the POR.  Final Results, 64 Fed. Reg. at 62,175.

**CONCLUSION**

Because the court finds that Commerce's determinations with respect to foreign like product and home market viability are supported by substantial evidence and are in accordance with law, the <u>Final Results</u> determination is AFFIRMED.

_____
Jane A. Restani
Judge

DATED:   New York, New York
         This 30th day of March, 2001